Opinion by Judge FARRIS; Dissent by Judge IKUTA.
ORDER
The panel has voted to deny the petition for rehearing in case number 10-56671; Judges Clifton and Ikuta vote to deny the petition for rehearing en banc, and Judge Farris so recommends.
Judges Farris and Clifton vote to deny the petition for rehearing in case number 10-56706; Judge Clifton votes to deny the petition for rehearing en banc, and Judge Farris so recommends. Judge Ikuta votes to grant the petition for rehearing and the petition for rehearing en banc.
The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear the matters en banc. Fed. R.App. P. 35.
The petitions for panel rehearing and the petitions for rehearing en banc are DENIED.
ORDER
The Opinion and Dissent filed September 13, 2012, slip opinion number 11179, and appearing at 697 F.3d 941, is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.
FARRIS, Circuit Judge:
OPINION
These associated appeals concern the aftermath of the shooting of Kristin Marie Maxwell-Bruce by her husband, Lowell Bruce.
I
Around 10:50 PM on December 14, 2006, Lowell, a San Diego County Sheriffs Department deputy, shot Kristin in the jaw with his Glock .40 caliber service pistol in the couple’s bedroom.[1] At the time, Lowell and Kristin lived in the home of Kristin’s parents, Jim and Kay Maxwell, along with Lowell and Kristin’s children and Kay’s father, Fred Stevens. Kristin was able to call 911 for help. Lowell also called 911 and told the 911 dispatcher that he had shot Kristin.
Deputy Jeffrey Jackson of the Sheriffs Department was dispatched to the scene and arrived at about 10:53 PM. Jackson, along with Bill Davis, a neighbor who happens to be a San Diego Police Department sergeant and who was apparently notified of the shooting via telephone by Jim, went into the Maxwell house. Jackson knew before he went into the house that the suspect was a fellow deputy sheriff. When Jackson arrived, he saw Kristin sitting in a *1080 chair, still talking to the 911 dispatcher. Jackson walked past Kristin and determined that Lowell was not a threat. Jackson took Lowell’s phone and told the 911 dispatcher to send the fire department. Jackson then escorted Lowell to Jackson’s patrol car. Jackson did not frisk Lowell for weapons or handcuff him.
Rani Gibbs, a neighbor of the Maxwells and a nurse, entered the house at about 10:58 PM. Gibbs found Kristin sitting in a chair, conscious, alert and oriented. At about 11:00 PM, an Alpine Fire Protection District fire truck arrived, carrying Captain Brian Boggeln, firefighter Colby Ross, and emergency medical technicians Michael Mead and Gerald Howell II. Their fire truck did not have space for a gurney.
Sheriffs Department Deputies William Reilly, Leonard Rodriguez, Warren Voth, and Gary Kneeshaw also arrived at the scene around 11:00 PM. Voth and Kneesh-aw were initially told they were not needed and prepared to leave. Jackson ordered Rodriguez to stay near the former’s patrol car and went back into the house with Reilly, where they retrieved Lowell’s gun.
The Alpine responders entered the house a few minutes later, and Gibbs left shortly thereafter. Ross and Mead also came in and began a medical examination of Kristin. The Alpine responders determined that Kristin’s vital signs and motor responses were normal and that she was able to communicate. They also diagnosed her with an airway obstruction. Boggeln and Ross placed a c-spine collar on Kristin.
The Alpine responders concluded that Kristin had to go to a trauma center quickly. They requested an air ambulance, which they believed to be the fastest mode of transport, and were informed it would arrive in 25 minutes at a landing zone 10 miles away. The air ambulance had advanced medical capabilities for dealing with trauma patients.
Around 11:08 PM, an ambulance from the Viejas Band of Kumeyaay Indians Tribal Fire Department arrived. The Vie-jas Fire ambulance, which carried paramedics Bradley Avi and Jeremy Felber, could transport Kristin to the landing zone.
At the time, Kristin’s vital signs were still within normal limits. The ambulance did not leave immediately. Rather, at some point, the ambulance’s engine was turned off. Sometime between 11:10 and 11:15 PM, Fred Stevens saw Kristin sitting alone in the dining room, holding a towel to her jaw.
Eventually, Avi and Felber brought in their backboard and gurney. With help from Ross and Mead, they placed Kristin on the backboard and taped her into place. The four men then carried Kristin to the Viejas Fire ambulance. When they arrived at the ambulance, Kristin began exhibiting signs of distress, expelling blood from her mouth. The four men tilted the backboard to allow the blood to drain, and Ross suctioned the blood. They made other efforts to assist her without success.
Meanwhile, Sergeant Michael Knobbe had arrived at the scene at 11:16 PM. Knobbe believed himself to be in charge. He was in fact outranked by Captain Gregory Reynolds and Lieutenant Anthony Salazar, who arrived around the same time as Knobbe. Nonetheless, Reynolds and Salazar stayed near the end of the driveway and did not interfere with Knobbe taking control of the crime scene.
Knobbe ordered Voth and Kneeshaw to stay at the crime scene. He also ordered the house evacuated and sealed and the Maxwells separated. Kay, Fred, and the children were placed in a motor home on the driveway. Jim was allowed to pace around the front of the driveway. Jim and Kay repeatedly asked to be allowed to stay *1081 together and follow Kristin to the hospital. They also told the deputies that they had not seen or heard anything involving the shooting. Nonetheless, they were told they had to stay and wait separately for investigators to interview them.
Based on Alpine’s estimates, Kristin was placed in the Viejas Fire ambulance between 11:18 and 11:25 PM. Sergeant Knobbe, however, refused to let the ambulance leave immediately because he viewed the area as a crime scene and thought that Kristin had to be interviewed. As a result of the delay, the ambulance did not leave until 11:30 PM. By that point, the air ambulance had already gotten to the landing zone.
The Viejas Fire ambulance took 11 minutes to get to the landing zone. Kristin died en route. The cause of death was blood loss from her gunshot wound. According to the San Diego County medical examiner, Kristin’s injuries were repairable.
At about 12:45 AM, Knobbe told Jim— who was still pacing on his driveway — that Kristin had died. At around 1:00 AM, Knobbe assigned Deputy Kneeshaw to monitor Jim. Jim told Kneeshaw that he was going to tell Kay about Kristin’s death. Kneeshaw told Jim that he had to stay put at the end of the driveway, to which Jim responded, “You are gonna have to shoot me, I’m going to see my wife!” Jim started to walk toward the mobile home. Kneeshaw told Jim to stop and tried to block his path. When Jim tried to continue walking, Kneeshaw sprayed him three times with pepper spray, struck him on the leg with his baton, and handcuffed him with Knobbe’s help. Salazar and Reynolds were still at the end of the driveway and did not intervene.
Jim was released from his handcuffs about half an hour later. He was still kept separate from the rest of his family until investigators finished interviewing Kay around 5:00 AM. Kay and the other family members did not learn about Kristin’s death until then.
The Maxwells sued several parties after the night’s events. These interlocutory appeals concern two sets of claims. In the first, the Maxwells allege various constitutional violations by Jackson, Reilly, Rodriguez, Voth, Kneeshaw, Knobbe, Reynolds, and Salazar (the “Sheriffs officers”) pursuant to 42 U.S.C. § 1983. In the second, the Maxwells seek tort damages under California law against the Viejas Fire Department and its paramedics, Avi and Fel-ber (the “Viejas defendants”), pursuant to 28 U.S.C. § 1367(a).
After discovery, the Sheriffs officers moved under Federal Rule of Civil Procedure 56 for summary judgment on the basis of qualified immunity. The Viejas defendants moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction, arguing they enjoyed tribal sovereign immunity. The district court denied the former motion and granted the latter.
II
We review de novo the district court’s ruling on summary judgment on the basis of qualified immunity. Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1075 (9th Cir.2011). “Our jurisdiction in these matters generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact.... Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.” Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir.2001). We also *1082 review de novo the district court’s determination that it lacks subject matter jurisdiction because of tribal sovereign immunity. Linneen v. Gila River Indian Cmty., 276 F.3d 489, 492 (9th Cir.2002).
Ill
We begin with the district court’s denial of summary judgment to the Sheriffs officers on the ground of qualified immunity. Qualified immunity protects government officers “from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To determine whether an officer is entitled to qualified immunity, we ask, in the order we choose, (1) whether the alleged misconduct violated a right and (2) whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). “For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted).
A
The Maxwells’ first claim alleges that the delay of Kristin’s ambulance violated the Fourteenth Amendment’s due process clause. The due process clause guarantees the right to “bodily security.” Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir.2006). The Maxwells contend that the Sheriffs officers violated Kristin’s right to bodily security by delaying her ambulance and thus ensuring her death.
Normally, the Sheriffs officers could not be held liable under § 1983 for an injury inflicted by a third party. L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992). There are, however, “two exceptions [to this rule]: (1) the ‘special relationship’ exception; and (2) the ‘danger creation’ exception.” Id. The Maxwells contend that either or both exceptions apply.
We agree that the danger creation exception applies. As of December 2006, it was well-established in this circuit that the danger creation exception applies where government officers “affirmatively placed the [victim] in a position of danger.” Wood v. Ostrander, 879 F.2d 583, 589-90 (9th Cir.1989) (internal quotation marks omitted). Officers affirmatively place a person in danger by leaving her “in a situation that [is] more dangerous than the one in which they found h[er].” Munger v. City of Glasgow Police Dep’t, 227 F.3d 1082, 1086 (9th Cir.2000). Impeding access to medical care amounts to leaving a victim in a more dangerous situation. See Penilla v. City of Huntington Park, 115 F.3d 707, 710 (9th Cir.1997).
The Sheriffs officers found Kristin facing a preexisting danger from her gunshot wound. There is evidence they affirmatively increased that danger by preventing her ambulance from leaving. This arguably left Kristin worse off than if the ambulance had been allowed to bring her to an air ambulance that had advanced medical capabilities and was ready to fly her to a trauma center.
The Sheriffs officers argue that our danger creation cases are distinguishable because they did not involve first responders securing a crime scene. But “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope, 536 U.S. at 741, 122 S.Ct. 2508. The existence *1083 of a crime scene does not change our analysis. It was irrelevant to the delay of the ambulance. The ambulance contained no witnesses or evidence apart from the victim herself and her wounds. Lowell had confessed and was in custody. The Sheriffs officers had found the gun used in the crime. The crime scene was sealed.
The Sheriffs officers also argue they lacked the mens rea to be held liable under § 1983, claiming the record does not show “deliberate indifference ... to known or obvious dangers.” Nicholas v. Wallenstein, 266 F.3d 1083, 1087 (9th Cir.2001). We reject the argument. It was obvious that delaying a bleeding gun shot victim’s ambulance increased the risk of death.
Finally, the Sheriffs officers appear to argue that the Maxwells must show that they acted with a “purpose to harm” Kristin since this case involved a medical emergency calling for split-second decisions. See Porter v. Osborn, 546 F.3d 1131, 1139 (9th Cir.2008). This contradicts their earlier recognition that the appropriate standard is one of deliberate indifference. It also nonsensically suggests that a medical emergency faced by third parties justified the decision to prevent those parties from responding to that emergency.
B
The Maxwells next allege that their mul-ti-hour detention and separation violated the Fourth Amendment’s ban on unreasonable seizures. We accept for the purpose of this appeal the Maxwells’ allegation that they were subject to seizure. The Sheriffs officers did not challenge this allegation in the district court or in their opening brief on appeal. They therefore waived the argument raised in their reply brief that there was no seizure. See Taniguchi v. Schultz, 303 F.3d 950, 958-59 (9th Cir.2002); Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir.1990).
The remaining question is whether, under our pre-December 2006 precedent, the detention was reasonable. Under the Maxwells’ version of the facts, they were seized for over five hours solely because they were witnesses to a crime. In deciding whether this was reasonable, we look to “the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.” Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
We note there are few cases discussing the reasonability of detaining witnesses solely for investigative purposes. In most cases, the lack of on-point precedent would compel us to grant qualified immunity. To apply a legal right at “a high level of generality would allow plaintiffs ‘to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.’ ” Groh v. Ramirez, 540 U.S. 551, 578, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Thomas, J., dissenting) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alteration in original).
Nevertheless, “in an obvious case, [general] standards can ‘clearly establish’ the answer, even without a body of relevant case law.” Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). This is an obvious ease. Although detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive.
In United States v. Ward, 488 F.2d 162 (9th Cir.1973) (en banc), we held that FBI agents’ detention of a person without “a founded suspicion of criminal activity” was unconstitutional. Id. at 169. There was *1084 no suspicion that the defendant had been involved in a particular crime. Id. Rather, the stop -was pursuant to a pre-existing criminal investigation and was made for the purpose of questioning the defendant about a third person. Id.
Ward has been read to prohibit involuntary detention of witnesses to a crime. See Walker v. City of Orem, 451 F.3d 1139, 1148 (10th Cir.2006). We do not read it quite so broadly. Ward contained two caveats that left the door open to investigatory witness detentions. First, it noted that the detention did not involve an “emergency situation.” 488 F.2d at 169. Second, it distinguished between federal agents— who can enforce only federal statutes — and local law enforcement officers — who have broader authority to detain as general “guardians of the peace.” Id.
Nonetheless, Ward clearly restricts investigative witness detentions by showing that in the hierarchy of state interests justifying detention, the interest in detaining witnesses for information is of relatively low value. Ward began its analysis by comparing the challenged detention to the type of investigative stop authorized by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Ward noted that Terry made “suspicion that criminal activity is afoot” the prerequisite for a lawful detention. 488 F.2d at 169. By using Terry as a starting point, Ward made clear that detention without suspicion of criminal activity involved a lesser state interest than a detention based on such a suspicion.
The Supreme Court decision authorizing detentions solely for the purpose of obtaining information confirms this common sense rule. In Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), the Supreme Court considered a traffic checkpoint set up so police could ask for information about a hit and run incident. The Supreme Court applied its normal Fourth Amendment reasonableness inquiry and determined the detentions were reasonable. The “[m]ost important! ]” reason, it explained, was that “the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect.” Id. at 427, 124 S.Ct. 885. The overall delay was “a very few minutes at most,” contact with the police “lasted only a few seconds,” and the contact “consisted simply of a request for information and the distribution of a flyer.” Id. at 427-28, 124 S.Ct. 885. By focusing on the traffic stop’s minimal intrusion on personal liberty, Lid-ster confirmed that the state interests justifying investigative witness detentions are lower than those justifying detention of suspected criminals.
We conclude that the Sheriffs officers were on notice that they could not detain, separate, and interrogate the Max-wells for hours. The Sheriffs officers have never claimed they had probable cause to arrest the Maxwells or reasonable suspicion for a temporary Terry detention. The crime was solved, and even if it had not been, it is a “settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer.” Davis v. Mississippi, 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Even in the Terry stop context — which involves a suspicion of criminal activity that is absent here — the Supreme Court has never endorsed a detention longer than 90 minutes. See United States v. Place, 462 U.S. 696, 709-10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
The Sheriffs officers’ reliance on Walker v. City of Orem, 451 F.3d 1139 (10th Cir.2006), is unavailing. In Walker, police officers shot a man and then forced his family into their house and interrogated them for 90 minutes. 451 F.3d at 1145. The Tenth *1085 Circuit held the detention was unconstitutional but granted qualified immunity because there was no clear circuit precedent prohibiting such a detention. Id. at 1151. This decision does not show the right was uncertain in this case. Walker held a detention like the one here unconstitutional six months before December 2006. Walker also noted that our circuit has clearly established case law on investigative witness detentions and strongly suggested it would have ruled differently if our holding in Ward governed. Id. at 1148. Further, Walker noted that the events in question predated Lidster. Thus, unlike the Sheriffs officers, the officers in Walker were not necessarily on notice that witness detention was subject to the Fourth Amendment reasonableness test. See 451 F.3d at 1151.
We also reject the argument that various exigencies made the detention reasonable as a matter of law. The Sheriffs officers cite Muehler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005), which held that “[a]n officer’s authority to detain incident to a search is categorical.” Id. at 98, 125 S.Ct. 1465. Muehler is inapposite. The Maxwells’ detention was not incident to a search. The Sheriffs officers did not obtain a search warrant until more than four hours after the detention began. The Maxwells were not “oecu-pant[s] of [their house] at the time of the search.” Id. at 98, 125 S.Ct. 1465.
The Sheriffs officers also cite Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001), which allows warrant-less seizures to prevent the destruction of evidence while law enforcement obtains a search warrant. There is, however, ample evidence that there was no such threat, and we have no jurisdiction in this interlocutory appeal to weigh sufficiency of the evidence. Mattos v. Agarano, 661 F.3d 433, 439 n. 2 (2011) (en banc). The perpetrator was in custody and the crime scene was sealed. The Maxwells followed orders to leave their house. Moreover, the Sheriffs officers arguably could have protected the integrity of the crime scene without detaining witnesses there. See Walker, 451 F.3d at 1149.
Last, the Sheriffs officers point to their need to secure the crime scene. But there is evidence they did not perceive such a need at the time. The Sheriffs officers were on the scene for over 20 minutes before Knobbe ordered the house evacuated. By that time, Lowell had confessed and voluntarily gone into custody. Jackson took Lowell into custody without handcuffing him or frisking him for weapons. We note again that weighing this evidence is beyond our jurisdiction. Mattos, 661 F.3d at 439 n. 2.
C
The Maxwells also claim that Jim’s treatment when he tried to rejoin his family violated the Fourth Amendment. When Jim tried to rejoin his family, he was pepper-sprayed, struck with a baton, and handcuffed. The Maxwells allege that these acts constituted an arrest (1) without probable cause and (2) with excessive force. Either type of arrest is an unreasonable seizure. Caballero v. City of Concord, 956 F.2d 204, 206 (9th Cir.1992); White v. Pierce Cnty., 797 F.2d 812, 816 (9th Cir.1986). We accept for the purposes of this appeal the Maxwells’ allegation that Jim was arrested. Thus, the questions are whether, under our pre-December 2006 precedent, probable cause existed or the degree of force was excessive. We conclude that there was no probable cause and the force was excessive.
Probable cause exists if the arresting officers “had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a pru *1086 dent person to believe that [the arrestee] had committed or was committing a crime.” United States v. Ricardo D., 912 F.2d 337, 342 (9th Cir.1990). The only crime identified by the Sheriffs officers is Jim’s refusal to obey Deputy Kneeshaw’s order not to rejoin his family. They argue this was a violation of California Penal Code § 148(a), which makes it a crime to “willfully resist[ ], delay[], or obstruct[] any ... peace officer.” Section 148(a) does not make it a crime, however, to resist unlawful orders. Smith v. City of Hemet, 394 F.3d 689, 695 (9th Cir.2005) (en banc).
The test for whether force was excessive is “objective reasonableness.” Graham v. Connor, 490 U.S. 386, 398, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Graham sets out a non-exhaustive list of factors for evaluating reasonability: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. Id. at 396, 109 S.Ct. 1865. Because this inquiry is fact-sensitive, summary judgment should be granted sparingly. Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002).
This case is not an exception. If Jim did not resist arrest — and the Sheriffs officers point to no evidence that he did — the use of pepper spray alone could constitute excessive force. See Headwaters Forest Defense v. Cnty. of Humboldt, 276 F.3d 1125, 1129-30 (9th Cir.2002).
D
We must decide whether to grant summary judgment to Captain Reynolds and Lieutenant Salazar alone. Reynolds and Salazar did not directly participate in any of the allegedly unlawful acts. The Maxwells contend that summary judgment is nonetheless inappropriate because a jury could reasonably find Reynolds and Salazar liable as the ranking officers present. We agree. A supervisor is liable under § 1983 for a subordinate’s constitutional violations “if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.” Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989). Reynolds and Salazar testified that they were mere observers who stayed at the end of the Max-wells’ driveway. But based on the Max-wells’ version of the facts, which we must accept as true in this appeal, we draw the inference that Reynolds and Salazar tacitly endorsed the other Sheriffs officers’ actions by failing to intervene. It is undisputed that Reynolds and Salazar were aware of the Maxwells’ detention and witnessed at least part of Jim’s arrest and beating. Reynolds testified that he heard Kneeshaw yelling “stop, stop, stop” right before the latter pepper-sprayed and struck Jim. Salazar testified that he heard a “commotion” at that time. On this appeal we do not weigh the evidence to determine whether Reynolds and Salazar’s stated reasons for not intervening are plausible. Mattos, 661 F.3d at 439 n. 2.
IV
We next consider whether the Viejas defendants are immune from suit because of tribal sovereign immunity. “Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe.” Cook v. AVI Casino Enterprises, Inc., 548 F.3d 718, 725 (9th Cir.2008). It also protects tribal employees in certain circumstances. See id. at 727.
A
The Maxwells argue first that the Viejas defendants lack tribal sovereign immunity *1087 because the Viejas Band waived it. The Maxwells rely on California Health and Safety Code § 13863(b), which provides:
A [fire protection] district may ... enter into mutual aid agreements with [a] federally recognized Indian tribe that maintains a full-time fire department. The ... federally recognized Indian tribe, or any of its employees, shall have the same immunity from liability for civil damages on account of personal injury to or death of any person ... resulting from acts or omissions of its fire department personnel in the performance of the provisions of the mutual aid agreement as is provided by law for the district and its employees, except when the act or omission occurs on property under the control of the ... federally recognized Indian tribe.
The Maxwells attached to their complaint documents showing the Viejas Fire paramedics came to the Maxwells’ house pursuant to an agreement between the Viejas Band and the Alpine Fire Protection District. They argue these agreements should be construed as mutual aid agreements authorized by § 13863(b). They further argue that by entering into mutual aid agreements, the Viejas Band agreed that its fire department and fire department employees would have “have the same immunity” as their California counterparts for acts performed in California. Cal. Health & Safety Code § 13863(b). California firefighters are not immune for gross negligence. Cal. Health & Safety Code §§ 1799.106, 1799.107. Thus, the Maxwells conclude, the Viejas Band waived sovereign immunity for the Viejas defendants to the extent the Max-wells have alleged gross negligence.
We reject the argument. Waivers of tribal sovereign immunity must be explicit and unequivocal. See Burlington N. & Santa Fe Ry. Co. v. Vaughn, 509 F.3d 1085, 1091 (9th Cir.2007). Each agreement identified by the Maxwells explicitly retains the Viejas Band’s sovereign immunity.[2]
The Maxwells cite no authority for ignoring the clear content of these agreements in favor of state statutory language to which the Viejas Band never agreed. In each case they cite, the Indian tribe explicitly subjected itself to the authority of another sovereign’s courts. See, e.g., C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 422, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001); Marcean v. Blackfeet Hous. Auth., 455 F.3d 974, 981 (9th Cir.2006). We will not infer that the Viejas Band intended the exact opposite of what it said simply because it acted in the shadow of another sovereign’s law.
B
In addition to their waiver argument, the Maxwells claim that the Viejas Fire paramedics lack tribal sovereign immunity because (1) they have been sued as individuals (2) for acts that did not involve a policy or discretionary function. We agree with the Maxwells’ conclusion but for a different reason. We conclude that the Viejas Fire paramedics do not enjoy tribal sovereign immunity because a remedy would operate against them, not the tribe. See Shermoen v. United States, 982 F.2d 1312, 1320 (9th Cir.1992).
Tribal sovereign immunity derives from the same common law immunity principles *1088 that shape state and federal sovereign immunity. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); Cook, 548 F.3d at 727. Normally, a suit like this one — brought against individual officers in their individual capacities — does not implicate sovereign immunity. See Miranda B. v. Kitzhaber, 328 F.3d 1181, 1190 (9th Cir.2003). The plaintiff seeks money damages “not from the state treasury but from the officerfs] personally.” Alden v. Maine, 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Due to “the essential nature and effect” of the relief sought, the sovereign is not “the real, substantial party in interest.” Ford Motor Co. v. Dep’t of Treasury of Ind., 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945).
Our remedy-focused analysis is less categorical than the Maxwells’ proposed rule. While individual capacity suits against low-ranking officers typically will not operate against the sovereign, we cannot say this will always be the case. In any suit against tribal officers, we must be sensitive to whether “the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the [sovereign] from acting, or to compel it to act.” Shermoen, 982 F.2d at 1320 (internal citations and quotation marks omitted).
The Viejas defendants point to language in many of our cases stating that “[t]ribal sovereign immunity ‘extends to tribal officials when acting in their official capacity and within the scope of their authority.’ ” Cook, 548 F.3d at 727 (quoting Linneen, 276 F.3d at 492). Facially, this language suggests the Viejas Fire paramedics enjoy tribal sovereign immunity. Cook, for example, held low-ranking tribal employees were immune from claims that they performed their tribal duties in a grossly negligent way.[3] Id.
Cook, however, is consistent with the remedy-focused analysis discussed above. In Cook, the plaintiff had sued the individual defendants in their official capacities in order to establish vicarious liability for the tribe. 548 F.3d at 727. Thus, when Cook invoked the “scope of authority” principle, it was because the tribe was the “real, substantial party in interest.” Id. The plaintiff could not “circumvent tribal immunity through ‘a mere pleading device.’ ” Id. (quoting Will v. Mich. Dep’t of State Police, 491 U.S. 58, 70-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). In short, Cook conflated the “scope of authority” and “remedy sought” principles because they are coextensive in official capacity suits.
This does not change the rule that individual capacity suits related to an officer’s official duties are generally permissible. As the Tenth Circuit has explained: “The general bar against official-capacity claims ... does not mean that tribal officials are immunized from individual-capacity suits arising out of actions they took in their official capacities.... ” Native Am. Distrib. v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1296 (10th Cir.2008) (emphasis in original). “Rather, it means that tribal officials are immunized from suits brought against them because of their official capacities — that is, because the powers they possess in those capacities enable them to grant the plaintiffs relief on behalf of the tribe.” Id. (emphasis in original).
*1089 Several of our cases have referred to the “scope of authority” principle in individual capacity suits against tribal officers. But in that context, the “scope of authority’ language refers to the principle that allegations of acts outside an officer’s authority are by definition individual capacity claims. See Chemehuevi Indian Tribe v. Cal. State Bd. of Equalization, 757 F.2d 1047, 1051 (9th Cir.1985) (overruled on other grounds by Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985)). This does not mean that the “scope of authority’ and “remedy sought” principles are coextensive in individual capacity claims. Such a conclusion would be a major departure from the common law immunity doctrine that shapes tribal sovereign immunity.
The Viejas defendants’ reliance on Hardin v. White Mountain Apache Tribe, 779 F.2d 476 (1985), is misplaced. In Hardin, a tribal council ordered tribal police to eject the plaintiff from tribal land. Id. at 478. The plaintiff sued the tribe, several tribal institutions, and various officials in their individual capacities for declaratory and injunctive relief and damages. Id. We concluded the alleged actions were within the scope of the tribe’s powers and that the tribe and its institutions were thus covered by sovereign immunity. Id. at 478-79. We then affirmed dismissal of the claims against the tribal officials, noting simply that they had “act[ed] in their representative capacity and within the scope of their authority.” Id. at 479.
Hardin did not mention the “remedy sought” principle when it granted sovereign immunity, but it did not need to do so. Hardin was in reality an official capacity suit. Hardin did not (1) identify which officials were sued in their individual capacities or (2) the exact nature of the claims against them. But the use of the word “officials” suggests the plaintiff had sued high-ranking tribal council members for voting to eject him. Holding the defendants liable for their legislative functions would therefore have attacked “the very core of tribal sovereignty.” Baugus v. Brunson, 890 F.Supp. 908, 911 (E.D.Cal.1995).
Evans v. McKay, 869 F.2d 1341 (9th Cir.1989), also does not affect our analysis. Evans denied sovereign immunity to individual tribal defendants sued under § 1983 and alleged to have acted in concert with state officers accused of constitutional violations. Id. at 1348. In a footnote, Evans suggested that Hardin displaced the “remedy sought” principle by citing its “scope of authority’ language. Id. at 1348 n. 9. If Evans took the broadest possible reading of Hardin, it was mistaken for the reasons discussed above. That reading would also be dicta. The same footnote acknowledged that suits over plainly unlawful acts are individual capacity suits by definition and could have rested on that ground. See id.
In short, our tribal sovereign immunity cases do not question the general rule that individual officers are liable when sued in their individual capacities. We see no reason to give tribal officers broader sovereign immunity protections than state or federal officers given that tribal sovereign immunity is coextensive with other common law immunity principles. See Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. 1670. We therefore hold that sovereign immunity does not bar the suit against the Viejas Fire paramedics as individuals. The Viejas Band is not the real party in interest. The Maxwells have sued the Vie-jas Fire paramedics in their individual capacities for money damages. Any damages will come from their own pockets, not the tribal treasury. See Alden, 527 U.S. at 757, 119 S.Ct. 2240.
*1090 At oral argument, the Viejas defendants gave two reasons why the Viejas Band could be the real party in interest in this suit. First, they suggested that the Viejas Band might have indemnified the paramedics and would thus have to pay for any liability. But even if an indemnification agreement exists, it would be “a purely intramural arrangement” between a sovereign and its officers. Demery v. Kupperman, 735 F.2d 1139, 1148 (9th Cir.1984) (internal quotation marks omitted). The unilateral decision to insure a government officer against liability does not make the officer immune from that liability. See id. Second, they suggested that liability would impact the Viejas Band’s ability to hire paramedics. But this case concerns allegedly grossly negligent acts committed outside tribal land pursuant to an agreement with a non-tribal entity. In this context, denying tribal sovereign immunity to individual employees sued as individuals will have a minimal effect, if any, on the tribe’s hiring ability.
V
We therefore affirm the district court’s denial of summary judgment on the ground of qualified immunity to the Sheriffs officers with regards to the Maxwells’ Fourteenth Amendment due process claim and Fourth Amendment search and seizure claims, reverse the district court’s granting of the Viejas defendants’ motion to dismiss for lack of subject matter jurisdiction due to tribal sovereign immunity, and remand for further proceedings. Costs are awarded to plaintiffs-appellants.
AFFIRMED in part, REVERSED in part, and REMANDED.

. These cases come to us in different procedural postures and thus require us to consider different parts of the record. Case 10-56706 follows the denial of summary judgment. We review that decision in light of the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials” in the record. Fed.R.Civ.P. 56(c)(1)(A). Case 10-56671 follows the grant of a motion to dismiss for lack of subject matter jurisdiction. In reviewing such a dismissal, "we may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice.” Colony Cove Props., LLC v. City of Carson, 640 F.3d 948, 955 (9th Cir.2011) (internal quotation marks omitted). We recite the cases’ shared backgrounds together for the reader's convenience but limit our analysis of each claim to the appropriate parts of the record.

. We do not address the Viejas defendants’ argument that each agreement predating December 2006 cannot be construed as falling under § 13863(b). We need not determine how California or tribal law defines these agreements because they do not satisfy the federal standard for waivers of tribal sovereign immunity.

. We reject the Maxwells’ argument that the Viejas Fire paramedics acted outside their authority by taking part in the unconstitutional interference with Kristin’s medical care. See Evans v. McKay, 869 F.2d 1341, 1348 n. 9 (9th Cir.1989). The Maxwells waived that argument by suing the paramedics for state law torts only. We have reviewed the Max-wells' complaint and find no allegations supporting § 1983 liability for the paramedics.