DOLLY M. GEE,UNITED STATES DISTRICT JUDGE
This matter is before the Court on the parties' motions for summary judgment or partial summary judgment. Plaintiffs Michael Rabinovitz and his daughter, M.R., a minor (by and through her Guardian ad Litem , Ronald Austin) seek partial summary judgment as to Defendants City of Los Angeles' ("the City") and Los Angeles Police Department's ("LAPD" or "the Department") municipal liability under 42 U.S.C. section 1983. [Doc. # 61 ("Pls' MSJ").] Defendants, the City and Officer Arvin Buenaventura, move for summary judgment or partial summary judgment as to Plaintiffs' civil rights claims under 42 U.S.C. section 1983. [Doc. # 59 ("Defs' MSJ").] For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' MSJ, and GRANTS Plaintiffs' MSJ.
*940 I.
PROCEDURAL BACKGROUND
On December 29, 2016, Plaintiffs filed the operative First Amended Complaint ("FAC"), bringing civil rights causes of action under 42 U.S.C. sections 1983 against, as relevant here, the City and Officer Buenaventura in connection with an interaction between Buenaventura and M.R. that occurred at M.R.'s school. [Doc. # 27.][1]
Days before the parties filed the instant motions, pursuant to a Joint Stipulation, this Court dismissed "[t]hose portions of the First, Second and Third Claims for Relief in [the FAC] that are based upon [Officer] 'Buenaventura's interview' and any alleged violation of the Fifth Amendment in such Claims for Relief." [Doc. # 58.] This dismissal "[did] not affect Plaintiffs' First, Second and Third Claims for Relief based upon [Officer] 'Buenaventura's coercion,' " and the dismissal did not constitute Plaintiffs' "dismiss[al], waiv[er], or releas[e] [of] their claims that [Officer Buenaventura] violated their Constitutional rights when he seized and interviewed Plaintiff M.R. on May 21, 2015." Id.
On January 12, 2018, both sides filed the motions now before the Court. Defendants seek summary judgment or partial summary judgment on the following grounds:
1. Reasonable suspicion supported M.R.'s temporary detention to investigate whether she was sexually abused by her mother's boyfriend; any threat by Buenaventura to arrest M.R. did not violate the Constitution; in the alternative, Buenaventura is entitled to qualified immunity on the Fourth Amendment claim;
2. Buenaventura's investigation did not interfere with Plaintiffs' Fourteenth Amendment right to their parent/child relationship; in the alternative, Buenaventura is entitled to qualified immunity on the Fourteenth Amendment claim;
3. Plaintiffs fail to establish Buenaventura retaliated against them in violation of their First Amendment rights; in the alternative, Buenaventura is entitled to qualified immunity on the First Amendment retaliation claim; [and]
4. The City of Los Angeles is entitled to summary judgment on Plaintiffs' Monell claims because LAPD's policies, practices, and customs relating to school interviews of suspected child abuse victims did not violate the Constitution.
Defs' MSJ at 2.
Plaintiffs seek partial summary judgment only as to their Monell[2] claim, arguing that
Defendant City of Los Angeles, Los Angeles Police Department['s] ... policies and procedures were the moving force behind Defendant Buenaventura's violation of Plaintiff M.R.'s Fourth Amendment right to be free from unreasonable seizure and Plaintiff Michael Rabinovitz's Fourteenth Amendment procedural due process rights and right to be free from unreasonable intereference with familial association.
Pls' MSJ at 2.
On February 16, 2018, the Court held a hearing on the motions. [Doc. # 71.]
*941 II.
FACTUAL BACKGROUND[3]
The Court sets forth the following undisputed material facts.
A. The May 21, 2015 Incident
On May 21, 2015, M.R. was a 14-year-old sophomore at Oak Park High School. Defs' SUF at ¶¶ 7, 9; Pls' SUF at ¶¶ 1-2. At the time, Rabinovitz had full legal and physical custody of M.R. Officer Buenaventura, then a 21-year veteran of the LAPD, worked in the juvenile unit at the Department's Topanga station. Pls' SUF at ¶¶ 3-5. Buenaventura's primary job was to investigate suspected child abuse and, specifically, Suspected Child Abuse Reports ("SCAR") prepared by the Department of Children and Family Services ("DCFS"). Id. at ¶ 6; Ex. 1 to Shapero Decl. ("Buenaventura Depo.") at 11:24-12:6 [Doc. # 59-2[4] ].
On May 4, 2015, Buenaventura was tasked with investigating a SCAR concerning M.R. ("Subject SCAR"). Defs' SUF at ¶ 4; Ex. 9 to Cox Decl. (Subject SCAR) [Doc. # 66-12]. The Subject SCAR, filed by a counselor at M.R.'s school on April 27, 2015, indicated that someone found a letter, which M.R. wrote, indicating that she had an "inappropriate relationship" with her mother's boyfriend. Defs' SUF at ¶ 5; Pls' SUF at ¶ 18; Subject SCAR at 5. Because M.R. lived with Rabinovitz and her mother lived out of state and had not been involved in M.R.'s life "for years," the Subject SCAR stated that M.R. was "not in immediate danger." Subject SCAR at 5. The Subject SCAR also indicated that it was unknown when the purported inappropriate relationship occurred. Id. Rabinovitz did not know about the letter M.R. wrote or the purported contact between M.R. and her mother's boyfriend, and law enforcement never suspected Rabinovitz was involved in the alleged abuse. Pls' SUF at ¶¶ 19-20.[5]
Because the SCAR's allegations described a "situation" that did not require "immediate attention," Buenaventura did not interview M.R. until over two weeks later. Buenaventura Depo. at 71:16-25. On May 21, 2015, Buenaventura decided to interview M.R. while she was at school. Defs' SUF at ¶ 7.[6] Prior to interviewing *942 M.R., Buenaventura did not contact DCFS to learn whether it had evaluated or investigated the SCAR's allegations. Pls' SUF at ¶ 23. Nor did Buenaventura contact Rabinovitz (despite the SCAR's inclusion of Rabinovitz's contact information) about the SCAR or tell Rabinovitz that he wanted to interview M.R. Id. at ¶ 25; Pls' ASUF at ¶ 9. Buenaventura knew nonetheless that the alleged abuse did not involve Rabinovitz. See Ex. 9 to Cox Decl. (Buenaventura's Detective's Case Progress Log) at 1 [Doc. # 61-14].
M.R. was pulled out of class and taken to Mr. Buchanan's (school principal) office, where Mr. Buchanan informed her that "a police officer [was] there to see her." Pls' SUF at ¶¶ 28-29, 31. M.R. was "terrified" because she did not know what was going on and immediately asked the principal if she could call her father because she wanted "to find safety in [her] dad." Id. at ¶¶ 32-33. M.R. called and sent text messages to her father and attorney but at first was unable to reach them. Defs' SUF at ¶ 12. While trying to contact them, Mr. Buchanan told M.R. to go into another room to speak with Buenaventura. Pls' SUF at ¶ 36. M.R. told the principal she did not want to speak to police. Id. at ¶ 13.
It appears that by the time M.R. entered the second room for the interview, she had reached her father. Defs' SUF at ¶ 15; Ex. 3 to Shapero Decl. ("M.R. Depo.") at 25:1-23 [Doc. # 59-4[7] ]. Once M.R. reached her father, who was with his attorney at the time, M.R. put them on speakerphone. Defs' SUF at ¶ 37; see Iulianelli Decl. at ¶¶ 7-12 (Rabinovitz's then-attorney detailing the May 21, 2015 events from the time M.R. got in contact with Rabinovitz). During the interview, M.R. told Buenaventura that she did not wish to speak to him without her attorney present. Defs' SUF at ¶ 38. When Buenaventura asked for her name and grade level, M.R. refused to answer and told him "repeatedly," "I don't know. Ask my lawyers." Pls' SUF at ¶ 16. Mr. Buchanan was present during M.R.'s interview. See M.R. Depo. at 23:20-23:25, 27:10-15, 32:12-16.
When Rabinovitz and his attorney asked why Buenaventura did not ask for Rabinovitz's consent to interview M.R., what exigent circumstances existed that allowed Buenaventura to conduct the interview, and why Buenaventura went to the school to interview M.R., Buenaventura responded that he did not require either exigency or consent to conduct the interview. Pls' SUF at ¶ 42; see also Ex. 6 to Shapero Decl. ("Rabinovitz Depo.") at 12:18-13:2 [Doc. # 61-10[8] ] (Rabinovitz testifying at his deposition that he told Buenaventura, "you need my permission to talk with M.R., and you don't have it.... I got a response, and I was told [by Buenaventura] that my permission wasn't needed"). Then, while Rabinovitz was still on speakerphone, Buenaventura threatened to arrest M.R. and take her to the station for questioning if she did not answer his questions. Pls' SUF at ¶ 17. M.R. began to cry and, throughout the entire encounter, was "hysterical, crying, and asking her father what to do." Id. at ¶ 45; Defs' SUF at ¶ 18.
At some point, Buenaventura left the conference room and terminated the interview. See Buenaventura Depo. at 103:9-23; Iulianelli Decl. at ¶ 12 [Doc. # 61-2] (stating that Buenaventura stopped questioning after approximately an hour's worth of discussion among LAPD employees and representatives, Rabinovitz's attorney, and Los Angeles City's and County's attorneys). The entire incident, from the time Buenaventura arrived at the school and left the premises, took 68 minutes. Ex. 11 to Cox Decl. [Doc. # 61-16]; Buenaventura *943 Depo. at 102:21-103:8. Rabinovitz estimated that the phone call (where he and his counsel were on speakerphone) lasted four to nine minutes. Defs' SUF at ¶ 32. M.R. testified that she had "no clue" how long she spent in the conference room with Buenaventura, that it "could have been" between 20 and 30 minutes, but it "felt like" an hour. Id. at ¶ 21; M.R. Depo. at 32:23-33:4. Buenaventura estimates that he and M.R. were in the conference room for 10 minutes. Buenaventura Depo. at 103:24-104:2.
Since (and allegedly because of) the May 21, 2015 incident, M.R. has experienced an increase in frequency of depression and migraines. Pls' SUF at ¶ 47.[9]
After, and based on, Buenaventura's attempted interview of M.R., LAPD's Internal Affairs Division investigated a personnel complaint directed against Buenaventura. Defs' SUF at ¶ 49. The Division determined that the allegations were "unfounded, meaning the [complained-of] act did not occur as alleged in that [personnel] complaint." Id. at ¶ 50. As a result, Buenaventura was not disciplined. Id. at ¶ 51. Buenaventura has never been disciplined "in any way in connection with a school interview." Pls' ASUF at ¶ 34.
B. Official Practices Regarding Interviews of Suspected Child Abuse Victims
On May 1, 2013, the Office of the Chief of Police issued a notice of changes in LAPD procedures for on-campus investigations of child victims or witnesses. Pls' SUF at ¶ 50; Ex. 13 to Cox Decl. ("May 2013 Notice") [Doc. # 61-18]. The procedures announced in the Notice were in effect at the time of M.R.'s interview. Pls' SUF at ¶¶ 50-51. The May 2013 Notice indicates that officers should "notify the child's parent(s) and/or guardian(s) when appropriate." May 2013 Notice at 1. The accompanying "LAUSD[10] Legal Brief" on requests for interviews on campus, which officers should present to school administrators if those administrators refuse to facilitate the requested interview, states that law enforcement "can interview anyone regarding suspected child abuse," and that where there is suspected in-home abuse, the school "should not" contact the child's parent about the interview. Id. at 2. The Brief contains no additional information about contacting the interviewee's parents or information about constitutional rights of parents and children that an interview may implicate. See id. ; Pls' SUF at ¶ 52.
The then-governing LAPD Manual contains a chapter entitled School Investigations. Pls' SUF at ¶ 53. Section 2500 of that chapter governs police investigations at school. See Ex. 14 to Cox Decl. [Doc. # 61-19]. Section 2500 indicates that when an investigation involves the questioning of a minor student on school premises, during school hours, the officer "shall" contact the school principal and explain the reason for questioning the student; request permission to interview the student at school; attempt to secure a secluded place to interview the minor; and, when the interview involves a suspected victim of child abuse, afford the minor the option of being interviewed *944 in private and inform the minor of such a right before questioning. Id. Section 2500 is unclear to whom the officer should direct a request for permission to interview the student at school. See id.
The LAPD's other written materials and training "essentially" mirror California Penal Code section 11174.3. Defs' SUF at ¶ 35. Consistent with that statute, officers investigating SCARs should check in with school administrators to inform them of the need to conduct an interview, and the on-campus interview should occur in a private setting with the support of a child advocate when appropriate. Id. at ¶ 36; Cal. Penal Code § 11174.3(a). The minor interview may select any school staff member to be present upon request. Defs' SUF at ¶ 36; Cal. Penal Code § 11174.3(a).[11] Although officers should obtain advice about parental notification prior to interviewing a child for crime investigations generally, child abuse and neglect cases are considered an exception. Defs' SUF at ¶ 36. While not formally written into any official policy, it is undisputed that "LAPD instructs officers not to notify parents before conducting a school interview regarding suspected abuse."Id. at ¶ 40 (emphasis added). Apparently, this instruction applies, as here, even when the parent is not the suspected abuser.
There do not appear to be any written policies governing officer conduct during the interview of a minor suspected child abuse victim. Frank Ramirez of the LAPD testified nonetheless that while it is not official policy, procedure, practice, or custom, it is also not against official policy, procedure, practice, or custom for an officer to inform the minor interviewee that he will take the child to the police station if the child does not permit the officer to conduct the interview at school. Ramirez Depo. at 142:18-143:7. Similarly, an officer's threat to arrest the minor interviewee in such a circumstance would not be in conformance with Department policy, procedure, practice, or custom, but it also is not against such official policy, procedure, practice, or custom. Id. at 149:4-16, 150:21-152:10. In other words, such conduct is "not best practice, but it's still not prohibited." Id. at 152:8-10.
As for officer training, the LAPD Academy instructs recruits using the California Police Officer Standards and Training ("POST") guidelines. Defs' SUF at ¶ 37. POST does not train recruits on conducting on-campus interviews of suspected child abuse victims. Id. Recruits do receive instruction on interviewing child victims more generally, but in Learning Domain 9, which is part of POST, "there is nothing directly about interviewing a child at school." Ex. 4 to Cox Decl. ("Korinek Depo.") at 28:4-24 [Doc. # 61-8].
Officers and investigators assigned to juvenile units or divisions are not trained that, prior to interviewing a suspected child abuse victim at school, they must have parental consent, presence of exigent circumstances, or judicial authorization. Defs' SUF at ¶ 38. Officers are not even trained on how to obtain a warrant or court order before interviewing a minor on a school campus. Ex. 3 to Cox Opp. Decl. ("Gomez Depo.") at 93:25-94:6 [Doc. # 66-6]. Moreover, LAPD instructs officers not to notify parents before such an interview. Defs' SUF at ¶ 40. Additionally, officers are not trained that there is "any need for having reasonable suspicion of child abuse being committed or being conducted by a *945 parent before conducting an interview" of a minor at school. Gomez Depo. at 93:16-23. Notably, officers employed by the City are not trained to handle a SCAR that alleges the victim's parent or guardian is the abuser or complicit with the abuse any differently from a SCAR that does not have such an allegation. Pls' ASUF at ¶ 29.
Because of California Penal Code section 11174.3's authorization, officers are not trained on any due process requirements that school interviews must satisfy. See Gomez Depo. at 96:4-99:19. Additionally, officers are not instructed or trained to inform a suspected child abuse victim interviewee that he or she does not have to consent to the interview or that he or she may leave the interview. Defs' SUF at ¶ 43. Officers may continue to question the minor about suspected child abuse even if the child informs the officer that the interview is unwelcome. Id. at ¶ 45.
During the three years that Buenaventura was an officer in the juvenile division, he went to a school to interview a child on approximately 900 to 1,000 occasions, and he only called the parents beforehand to apprise them of the interview two to three times, regardless of whether the parent was suspected of abuse. Pls' SUF at ¶¶ 79, 81-82. Buenaventura's practice with regard to on-campus interviews of children was to arrive at the school unannounced, dressed in full police uniform (including armed with a firearm and his badge), find someone in the school office, and inform that person that he needs to talk to a minor. Id. at ¶¶ 83-84. Although the topic may arise during the interview, Buenaventura did not tell the minor interviewees that they could refuse to speak with him. Id. at ¶ 85.
II.
LEGAL STANDARD
Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; accord Wash. Mut. Inc. v. United States , 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. Nat'l Ass'n of Optometrists & Opticians v. Harris , 682 F.3d 1144, 1147 (9th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby , 477 U.S. at 248, 106 S.Ct. 2505.
The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Id. at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 56(c), (e) ); see also Norse v. City of Santa Cruz , 629 F.3d 966, 973 (9th Cir. 2010) (en banc ) (" Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." Soremekun v. Thrifty Payless, Inc. , 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." Id.
When faced with cross-motions for summary judgment, the Court considers each motion on its own merits to determine whether the Rule 56 summary-judgment standard is satisfied.
*946 Fair Housing Council of Riverside Cty., Inc. v. Riverside Two , 249 F.3d 1132, 1136 (9th Cir. 2001). Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment. Del Real, LLC v. Harris , 966 F.Supp.2d 1047, 1051 (E.D. Cal. 2013) ; see also Asuncion v. Dist. Dir. of U.S. Immigration & Naturalization Serv. , 427 F.2d 523, 524 (9th Cir. 1970) (district court properly resolved motion for summary judgment where issues presented were comprised solely of questions of law).
III.
DISCUSSION
The Court addresses the motions before it as follows: first, the Court considers Plaintiffs' section 1983 claims against Buenaventura under the Fourth Amendment, then the claims under the Fourteenth Amendment, and, third, the claims under the First Amendment. The Court addresses Defendants' qualified immunity defense as necessary when resolving the claims against Buenaventura. Lastly, the Court considers Plaintiffs' section 1983 claim for municipal liability.
Because Defendants move for summary judgment on the section 1983 claims against Buenaventura, the Court views the facts in Plaintiffs' favor when analyzing those claims. Both sides move for summary judgment as to the Monell claim, so the standard applicable to cross-motions for summary judgment applies.[12]
A. Fourth Amendment
M.R. contends that Buenaventura violated her Fourth Amendment rights when he detained and interrogated her without a warrant or court order; parental consent, knowledge, or presence; and without immediate need or exigency. She maintains this aspect of her Fourth Amendment claim solely in connection with Buenaventura's allegedly coercive conduct during the interview. See FAC at ¶¶ 20-21; Doc. ## 57-58 (stipulation and *947 order dismissing certain claims). Buenaventura argues that reasonable suspicion justifies his interview conduct and that, in any event, he is entitled to qualified immunity.
Neither the Supreme Court nor the Ninth Circuit has addressed the Fourth Amendment's application to a law enforcement officer's in-school detention and interrogation of a suspected child abuse victim. In light of this uncertainty, the Court concludes that, even assuming (for the sake of argument) that the seizure and interview conduct were unreasonable, it would not have been clear to a reasonable officer in Buenaventura's position that his conduct was unlawful in the circumstances of this case. Qualified immunity therefore bars the Fourth Amendment claim against Buenaventura.
Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Mullenix v. Luna , --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Pearson v. Callahan , 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). The applicability of qualified immunity is a pure question of law. Torres v. City of Los Angeles , 548 F.3d 1197, 1210 (9th Cir. 2008). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " Ashcroft v. al-Kidd , 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). Supreme Court precedent "do[es] not require a case directly on point," but clearly established law should not be defined "at a high level of generality." Mullenix , 136 S.Ct. at 308 (quoting al-Kidd , 563 U.S. at 741, 742, 131 S.Ct. 2074 ). "The dispositive question is 'whether the violative nature of particular conduct is clearly established,' " and that inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. (quoting al-Kidd , 563 U.S. at 742, 131 S.Ct. 2074 ; Brosseau v. Haugen , 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ) ). Plaintiffs bear the burden of proving that the right at issue was clearly established. Alston v. Read , 663 F.3d 1094, 1098 (9th Cir. 2011).
In this Circuit, qualified immunity does not protect state actors from liability for Fourth Amendment violations where officers (or state-employed social workers), absent a warrant or exigent circumstances, enter a home to investigate, or remove children from their home in the pursuit of an investigation regarding, suspected child abuse. See Rogers v. County of San Joaquin , 487 F.3d 1288, 1291, 1297-98 (9th Cir. 2007) (reversing district court's grant of summary judgment in favor of defendants on qualified immunity grounds, and holding that "the law was clearly established ... that a child could not be removed from the home without prior judicial authorization absent evidence of 'imminent danger of serious bodily injury,' " which was not present (quoting Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs. , 237 F.3d 1101, 1106 (9th Cir. 2001) ) ); Calabretta v. Floyd , 189 F.3d 808, 812-17 (9th Cir. 1999) (affirming district court's denial of summary judgment on qualified immunity grounds where social worker and police officer entered minors' home without consent, probable cause, or a warrant or court order; there were no allegations of physical abuse of the minors; and the officials did not perceive any danger of injury to the children or of loss of *948 evidence in securing a warrant); see also Wallis v. Spencer , 202 F.3d 1126, 1138 (9th Cir. 2000) ("Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."). Nor does qualified immunity protect against the multi-hour detention and interrogation of witnesses to a crime-outside the context of child abuse investigations-absent probable cause, reasonable suspicion, or exigent circumstances. See Maxwell v. County of San Diego , 708 F.3d 1075, 1083-85 (9th Cir. 2013) (observing that the Supreme Court "has never endorsed a detention longer than 90 minutes" in the context of a Terry[13] stop).
Yet, law enforcement's authority to detain and interview-in a private area on a school campus-a minor who is a suspected victim of child abuse, without a warrant or court order or presence of exigent circumstances, is undecided. Indeed, in 2009, the Ninth Circuit considered a case directly on point in which a social worker, accompanied by a sheriff's deputy, detained and interrogated a minor-without a warrant, probable cause, or parental consent-in a private office at the minor's school for two hours. Greene v. Camreta , 588 F.3d 1011, 1015, 1017 (9th Cir. 2009), vacated in part , 563 U.S. 692, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011). The Green e Court affirmed the District Court's grant of summary judgment in favor of defendants due to qualified immunity, explaining that the Ninth Circuit's previous decisions in Calabretta and Wallis , supra , "would [not] have put [the social worker and police officer] on notice that a social worker's warrantless seizure of a child at her school, even in conjunction with a law enforcement officer, could violate the Fourth Amendment" because those cases involved the seizure and search of children in their homes. Id. at 1031 ; see Camreta v. Greene , 563 U.S. at 713-14 & n.11, 131 S.Ct. 2020 (leaving intact Circuit Court's ruling on qualified immunity[14] ).
In reaching this decision, the Ninth Circuit evaluated the facts under the two-step reasonableness test for special needs cases announced in New Jersey v. T.L.O. , 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), which is the test Defendants here ask the Court to apply in determining whether Buenavista violated M.R.'s Fourth Amendment rights. Greene , 588 F.3d at 1031-33 ; see also id. at 1026 n.11 (observing that some other Circuit Courts have applied that test to child abuse investigations cases, and collecting cases). Even under this "lesser standard," the Green e Court held that the two-hour detention at issue-at least an hour longer than the detention in this case-was not clearly unconstitutional, such that qualified immunity applied. Id. at 1031-33. Additionally, the *949 Court explained that the differences of opinion among Circuits were sufficiently substantial to "require" qualified immunity. Id. at 1031 (quoting Safford Unified Sch. Dist. No. 1 v. Redding , 557 U.S. 364, 378-79, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) ); see also Loftus v. Clark-Moore , 690 F.3d 1200, 1205-06 (11th Cir. 2012) (the minor, a suspected victim of child abuse, did not have clearly established Fourth Amendment right to be free from on-campus interrogation by state officials in connection with child welfare investigation).
The Ninth Circuit does not appear to have ruled on this issue since Green e , and Plaintiffs do not point to any binding case law or other authority to satisfy their burden that M.R.'s Fourth Amendment rights were clearly established in this context at the time of the encounter. The two Ninth Circuit cases to which Plaintiffs cite for support are inapposite. For example, Demaree v. Pederson concerned familial rights to live together without governmental interference protected by the Fourteenth Amendment-not Fourth Amendment rights to be free from unreasonable seizures. See 880 F.3d 1066, 1069 (9th Cir. 2018).[15] And, as mentioned above, Wallis dealt with seizure of the children in their home. 202 F.3d at 1136-37 ; see also L.A. Police Protective League v. Gates , 907 F.2d 879, 884 (9th Cir. 1990) ("Nowhere is the protective force of the [F]ourth [A]mendment more powerful than it is when the sanctity of the home is involved."). The other cases Plaintiffs cite in support are from outside of this Circuit and, accordingly, cannot define the contours of clearly established rights. See Cmty. House, Inc. v. City of Boise, Idaho , 623 F.3d 945,967 (9th Cir. 2010) ("To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act."). In any event, as the Ninth Circuit concluded in Green e , the unsettled nature of the rights at issue warrant application of qualified immunity.
Consequently, applying the doctrine of qualified immunity, the Court GRANTS Defendant Buenaventura's MSJ as to whether the alleged coercive nature of the interview gave rise to a Fourth Amendment violation.
B. Fourteenth Amendment
Plaintiffs' civil rights claim under the Fourteenth Amendment rests on Buenaventura's alleged unlawful detention of M.R., including the threat to take her to the police station, which Plaintiffs argue interfered with Rabinovitz's right to the care, custody, and control of his daughter and M.R.'s right to the care and comfort of her father. FAC at ¶¶ 33-34. As with the preceding claim, Defendants assert the defense of qualified immunity.
As a general matter, "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child. The state's interference with that liberty interest without due process of law is remediable under section 1983." Kelson v. City of Springfield , 767 F.2d 651, 655 (9th Cir. 1985). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." Lee v. City of Los Angeles , 250 F.3d 668, 685 (9th Cir. 2001) (alteration in original) (quoting *950 Smith v. City of Fontana , 818 F.2d 1411, 1418 (9th Cir. 1987) ). These general principles, however, are at too high a level of abstraction to be directly applicable in the unique circumstances of this case. See Mullenix , 136 S.Ct. at 308 (clearly established law should not be defined "at a high level of generality" (quoting al-Kidd , 563 U.S. at 742, 131 S.Ct. 2074 ) ).
As noted above, it was clearly established in May 2015, when Buenaventura detained and interrogated M.R., that a state actor may not remove children from their parents' custody, even temporarily, without prior judicial authorization or other exigent circumstances. See Jones v. County of Los Angeles ("Jones II "), --- Fed.Appx. ----, ----, 2018 WL 481334, at *2 (9th Cir. Jan. 19, 2018) (such right was clearly established in February 2010, when the conduct at issue occurred (citing Rogers , 487 F.3d at 1297 ) ); Wallis , 202 F.3d at 1136-41 (triable issue as to whether detectives had reasonable cause to remove children from their home in the middle of the night without a court order, and whether the scope and degree of state interference was justified where children placed in state institution apart from their parents for two and one-half months); Ram v. Rubin , 118 F.3d 1306, 1410 (9th Cir. 1997) (father was entitled to notice and hearing before police officer and social services administrator took children into protective custody, unless children were in imminent danger). It was also clearly established that M.R.'s familial due process rights could be violated through the state's temporary separation of her and her father. See Ovando v. City of Los Angeles , 92 F.Supp.2d 1011, 1018-20 (C.D. Cal. 2000) (finding that daughter has Fourteenth Amendment right in her father's society and comfort and may pursue section 1983 claim in connection with temporary loss of such right while father was imprisoned, and noting that "due process rights apply to the separation of parent and child, even if the separation is only temporary"). Here, M.R.'s temporary detention and interview did not cause M.R. to be separated from Rabinovitz (because she was at school and already apart from him), or result in the suspension of Rabinovitz's custodial rights, even temporarily.
Neither side has pointed to any case where an official's temporary seizure of a child on a school campus and during school hours interfered with the child's or parent's familial due process rights. Nor have the parties cited case law discussing these familial rights more broadly in the context of temporary questioning of a minor, on-campus or otherwise. Indeed, it appears that such rights are recognized primarily in the context of removal of parental custody, parental status determinations, or death. See Kelson , 767 F.2d at 654-55 (discussing parental due process rights' roots in Supreme Court and Ninth Circuit precedent, and pointing to cases in which officials moved the child out of state, state terminated parental status for unfitness, and state agent killed child).
In fact, in late 2013, the District Court for the Northern District of California rejected a minor plaintiff's section 1983 claim for interference with the parent-child relationship, noting that the Ninth Circuit has "only considered [parent-child relationship rights] impaired in situations such as the death of a child, the loss of parental rights, or the loss of contact or custody with the child." E.H. v. Brentwood Union Sch. Dist. , No. C13-3243 TEH, 2013 WL 5978008, at *2 (N.D. Cal. Nov. 4, 2013) (citing Ram , 118 F.3d at 1310 ; Kelson , 767 F.2d at 654-55 ). E.H. alleged that school officials concealed information from his parents about physical and emotional trauma inflicted upon him at school in violation of the Fourteenth Amendment, but because the allegations "f[e]ll short of a termination of parental rights or denial of custody," the Court dismissed the claim.
*951 Id. at *2-3 ; see also Harry A. v. Duncan , 351 F.Supp.2d 1060, 1068 (D. Mont. 2005) (" Kelson and the cases it cites establishes the existence of a constitutionally protected right to be free from termination of the parent-child relationship or from governmental interference with the parent-child relationship so intrusive as to be the equivalent of termination of that relationship.... [such as] the death of a child, the loss or imposition of parental rights and responsibilities, or the termination of daily contact with one's children.... Kelson and related cases do not provide constitutional protection from any state action that has the ultimate effect of disturbing the tranquility of the parent-child relationship."), aff'd 234 Fed.Appx. 463 (9th Cir. 2007). While District Court opinions (let alone unpublished ones) rarely affect the clearly established inquiry, these cases provide persuasive support for this Court's conclusion that the rights at issue were not clearly established at the time of the incident. See Prison Legal News v. Cook , 238 F.3d 1145, 1152 (9th Cir. 2001) (relying in part on unpublished district court decisions to determine the law was not clearly established).
Moreover, in the context of an official's allegedly improper seizure of children in the home, the Ninth Circuit has indicated that the parents' rights "should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association," whereas the seized minors' claims "should properly be assessed under the Fourth Amendment." Wallis , 202 F.3d at 1137 n.8 ; accord Jones v. County of Los Angeles ("Jones I "), 802 F.3d 990, 1000 (9th Cir. 2015), red'v in part on other grounds , --- Fed.Appx. ----, 2018 WL 481334 (9th Cir. Jan. 19, 2018). Thus, it is unclear whether M.R. may even pursue a claim for due process violations under the facts of this case.
Because the contours of Plaintiffs' due process rights, in the circumstances of this case, were not clearly established at the time of Buenaventura's seizure and attempted interview of M.R., the Court GRANTS Defendant Buenaventura's MSJ as to the Fourteenth Amendment claim based on qualified immunity.
C. First Amendment
Plaintiffs contend that Buenaventura violated their First Amendment rights when he, allegedly in response to Plaintiffs' "exercise of their legal rights ... to object to, refuse, and/or complain about the conduct of the LAPD and its officers," detained M.R. and threatened to take her to the police station if she refused to answer his questions, and when he interfered with Rabinovitz's legal custody rights of M.R. FAC at ¶¶ 27-28.[16] To succeed on a claim for retaliation in violation of the First Amendment, Plaintiffs must prove that (1) Buenaventura "took action that 'would chill or silence a person of ordinary firmness from future First Amendment activities' " and (2) Buenaventura's "desire to cause the chilling effect *952 was a but-for cause" of this action. Skoog v. County of Clackamas , 469 F.3d 1221, 1231-32 (9th Cir. 2006) (quoting Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1300 (9th Cir.1999) ).
The First Amendment protects both the "voluntary public expression of ideas" and the "concomitant freedom not to speak." Harper & Row Publishers, Inc. v. Nat. Enterps. , 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (quoting Estate of Hemingway v. Random House, Inc. , 23 N.Y.2d 341, 348, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968) ); see Blanco v. County of Kings , 142 F.Supp.3d 986, 992-93 (E.D. Cal. 2015) (stating the same in the context of First Amendment retaliation claim related to action taken against plaintiff after she refused to answer officers' questions); see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc. , 487 U.S. 781, 796-97, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Defendants do not appear to dispute that Plaintiffs' speech conduct falls within the scope of First Amendment protection. Instead, Defendants argue that Plaintiffs have failed to establish the requisite retaliatory intent to maintain a First Amendment retaliation claim. Defendants also assert qualified immunity. The Court addresses each in turn.
1. Evidence of Retaliatory Motive
First, the Court disagrees with Defendants as to retaliatory intent. Immediately in response to M.R.'s repeated refusal to answer his questions, and not long after Rabinovitz objected to the questioning and made clear that Buenaventura did not have his permission to speak with M.R., Buenaventura threatened to take M.R. to the police station to continue the interview. Given this, a reasonable jury could infer that Buenaventura threatened and continued to detain M.R. because of Plaintiffs' speech conduct, in an effort to chill it. Defendants' argument to the contrary-that the temporal proximity of the threat and the relevant speech conduct is insufficient to show causation-falls flat. See, e.g. , Coszalter v. City of Salem , 320 F.3d 968, 977-78 (9th Cir. 2003) (temporal proximity between protected activity and alleged retaliatory action may support inference of retaliation in a section 1983 action).
Additionally, the authority Defendants' cite in support of their temporal proximity argument is factually distinguishable and therefore inapposite. See Maidhof v. Celaya , 641 Fed.Appx. 734,735-36 (9th Cir. 2016) (plaintiffs did not show retaliatory motive where the evidence in support consisted of emails defendant officer wrote in the week leading up to the protest where arrests occurred, and emails did not demonstrate hostility toward protestors' cause but rather concerns over property damage, clean-up costs, and disruption of university activities, and frustration with protestors' bad faith negotiation in planning the protest); Blanco v. County of Kings , 142 F.Supp.3d 986, 990, 993 (E.D. Cal. 2015) (allegations that defendant officer questioned plaintiff suspect a second time in retaliation for plaintiff's refusal to answer officer's first round of questioning amounted to mere speculation where defendant first questioned plaintiff suspect while driving her to jail and then again at the jail after another officer found contraband on plaintiff during routine strip search during processing).
Defendants also argue that Buenaventura had "a strong objective basis to investigate whether M.R. was a sexual abuse victim," pointing to the Subject SCAR, which they contend defeats Plaintiffs' retaliatory motive argument. Defs' MSJ at 25. In support, they cite to *953 White v. County of Sanbernardino , 503 Fed.Appx. 551 (9th Cir. 2013) (unpublished), and Dietrich v. John Ascuaga's Nugget , 548 F.3d 892 (9th Cir. 2008).[17]
In Dietrich , the Ninth Circuit affirmed the District Court's grant of summary judgment on plaintiff's retaliatory First Amendment claim where the plaintiff alleged that defendant officers cited her for a traffic violation, after she drove through a barricade with a "road closed" sign, because she was registering voters and gathering signatures for a political petition at a large, multi-day urban event. 548 F.3d at 893-95. The Circuit Court rejected plaintiff's evidence of retaliatory motive-a newspaper article that ran the night before plaintiff was cited, which stated that the political group of which plaintiff was a part had been forced to leave an area of the street on the first day of the event-because she did not present any evidence that the officers actually read or knew of the article. Id. at 895, 901. Furthermore, the municipal court convicted plaintiff when she challenged the traffic citation, and the appellate court affirmed the conviction. Id. at 901. Accordingly, the Ninth Circuit explained that in a case such as Dietrich , where there is "very strong evidence of probable cause and very weak evidence of a retaliatory motive," the fact that defendant officers had probable cause, while not required to defeat retaliatory motive, "undoubtedly" has high probative value. Id.
In White , the Ninth Circuit came to a similar conclusion, relying in part on Dietrich . The Court explained that there was strong evidence of reasonable suspicion to support the pat-down search of plaintiff, which plaintiff argued was in retaliation for his inflammatory statements about the police. See 503 Fed.Appx. at 553 (detailing the reasonable suspicion evidence). The only evidence of retaliatory motive plaintiff presented was the temporal proximity of the inflammatory statements and the pat-down search. Id. The Court concluded that, on balance, no reasonable jury could conclude the officers' decision to conduct the pat-down was caused by retaliatory motive as opposed to the multiple pieces of evidence that supported reasonable suspicion, under Dietrich 's strong probable cause-weak retaliatory motive rule. Id.
Here, the evidence is not quite as one-sided. Although Plaintiffs also rely on the temporal proximity of the Plaintiffs' and Defendants' actions, Defendants' so-called probable cause evidence is not particularly strong. The Subject SCAR indicated that M.R. may be a victim of child abuse, but the SCAR also stated that she was not in immediate danger, that her mother's boyfriend (the perpetrator) likely lived out of state, that her mother had not been involved with M.R. for several years, and that M.R. lived with her father. Subject SCAR at 4-5. Additionally, it is undisputed that Rabinovitz was not suspected of any wrongdoing and had no knowledge of the possible abuse or the letter, which cuts against Defendants' argument that Plaintiffs objected to the questioning of M.R. in an effort to preclude the discovery of misconduct, as opposed to an exercise of their constitutional rights. See Pls' SUF at ¶¶ 19-20; Defs' MSJ at 26. Indeed, the absence of any emergency is particularly noteworthy here, where Buenaventura took over two weeks from the time he received notice of the allegations to investigate the alleged abuse.
Further, because M.R. was the suspected victim of abuse-not a suspected wrongdoer-the Subject SCAR's allegations only go so far in supporting Buenaventura's *954 continued detention and threats after Plaintiffs engaged in protected speech activity to stop the questioning. Cf. United States v. Ward , 488 F.2d 162, 169 (9th Cir. 1973) (en banc ) (finding an FBI's stop of appellant's car unreasonable under the Fourth Amendment where "there was no crime 'afoot' " because agents made the stop pursuant to a months' old general criminal investigation, there was no emergency situation or other need for immediate action, agents never sought in advance to arrange an interview with appellant despite their ability to do so, agents had no suspicion that appellant had violated or was going to violate federal law, and "most significantly, the stop was not made pursuant to the agent's founded suspicion that the detainee was involved or about to be involved in criminal activity" but rather "for the purpose of questioning the appellant about a third person ").
In any event, the Ninth Circuit held in Skoog that "a right exists to be free of police action for which retaliation is a but-for cause even if probable cause exists for that action." 469 F.3d at 1235. Construing the facts in Plaintiffs' favor, as the Court must on Defendants' motion for summary judgment, there is at least a triable issue of material fact as to whether Buenaventura took retaliatory action intended to chill Plaintiffs' First Amendment activity. In such a scenario, the jury would consider and weigh Defendants' probable cause and reasonable suspicion related arguments; the Court cannot resolve the factual dispute as a matter of law. Cf. Bruce v. Ylst , 351 F.3d 1283, 1289 ("[P]rison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right.").
2. Qualified Immunity
Defendants' qualified immunity defense fails to bar the First Amendment claim. Defendants argue that Buenaventura's conduct did not violate clearly established rights because it was not beyond debate that Plaintiffs actually were exercising their First Amendment rights when M.R. refused to answer, and Rabinovitz objected to, Buenaventura's questions-as opposed to engaging in an attempt to prevent the discovery of misconduct. In support of this proposition, Defendants cite Teahan v. Wilhelm , 481 F.Supp.2d 1115 (S.D. Cal. 2007), and Bridges v. Hubbard , No. CIV S-09-0940 TLN DAD P, 2013 WL 3773886 (E.D. Cal. July 17, 2013). While the District Courts in those cases came to different conclusions on the question of protected activity, the context of the Courts' analyses were distinct.
In Teahan , the District Court concluded that the prisoner plaintiff's allegations of First Amendment retaliation failed to show he engaged in protected activity under the Fifth-not First-Amendment because, according to the Court, a prisoner has no right to remain silent during a prison search. 481 F.Supp.2d at 1120 (citing Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ). The District Court said nothing about whether the prisoner's silence constituted First Amendment-protected activity, and it is not clear whether the parties raised or disputed the issue in that context. See id. In contrast, the District Court in Bridges concluded that the prisoner plaintiff was engaged in First and Fifth Amendment-protected activity when he refused to answer the officer's questions. 2013 WL 3773886, at *9 (citing Riley , 487 U.S. at 796-98, 108 S.Ct. 2667 ; United States v. Bodwell , 66 F.3d 1000, 1001 (9th Cir. 1995) ).
*955 Moreover, when considering whether summary judgment is appropriate on a qualified immunity defense, the Court must resolve all factual disputes in favor of the non-movant. Kirkpatrick v. County of Washoe , 843 F.3d 784, 788 (9th Cir. 2016). Under Plaintiffs' version of events, they objected to and remained silent in the face of Buenaventura's questioning, and Buenaventura threatened to arrest M.R. and continued the questioning in response to that protected activity-a factual position supported by evidence. Thus, the proper question for purposes of qualified immunity is whether it would have been clear to all but the plainly incompetent officials in Buenaventura's position that it would be a violation of individuals' constitutional rights to threaten to arrest and detain them because they engaged in protected speech conduct. The answer to that question is yes. See, e.g. , Lacey v. Maricopa County , 693 F.3d 896, 916 (9th Cir. 2012) ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right' ...." (quoting Hartman v. Moore , 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) ) ).
Buenaventura's qualified immunity defense therefore fails. Because there is a genuine dispute of material fact as to whether Buenaventura had the requisite retaliatory motive when he threatened and continued to detain M.R., and qualified immunity does not apply, the Court DENIES Defendant Buenaventura's MSJ on the First Amendment claim.
D. Monell Liability
Finally, the Court turns to the Monell claim against the City and LAPD (together, "the Municipal Defendants"). Both sides move for summary judgment as to this claim. Specifically, Plaintiffs seek partial summary judgment that the alleged municipal policies and procedures caused the violation of M.R.'s Fourth Amendment rights and Rabinovitz's Fourteenth Amendment rights. Pls' MSJ at 2. Defendants contend that Plaintiffs' Monell claim fails as a whole.
Plaintiffs contend that the Municipal Defendants' adherence to the following alleged policies, procedures, customs and practices caused the violation of Plaintiffs' constitutional rights: (1) "detaining and/or threatening to detain children from their parents without exigent circumstances ..., court order and/or consent of their parent or legal guardian;" (2) "causing minor children to be interviewed at school without Court Order, parental consent, parental knowledge, parental presence, and without just and reasonable cause;" (3) "retaliating against individuals who exercise their constitutional right including to object to, refuse, and/or complain about [LAPD]'s actions;" (4) "using intimidation, fear, threats, coercion, retaliation, misrepresentation and duress during ... investigations;" (5) "acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train and/or supervise its officers, agents and employees, in providing the Constitutional protections guaranteed to individuals ... when performing actions related to child abuse and neglect, and dependency type proceedings;" and (6) "acting with deliberate indifference in failing to correct ... the wrongful conduct of other employees" in connection with the previously mentioned purported policy. FAC at ¶ 40.
Defendants argue that because there is no respondeat superior liability under section 1983, the Municipal Defendants may not be held liable in the absence of a constitutional injury or violation. They also contend that Plaintiffs have failed to present sufficient evidence to support Monell liability. Because the Municipal Defendants are not entitled to qualified immunity, *956 the Court first must determine whether there is an underlying constitutional violation. See Pearson , 555 U.S. at 242-43, 129 S.Ct. 808 ; Trevino v. Gates , 99 F.3d 911, 918 (9th Cir. 1996). As explained above, the Court has already determined that there is a genuine dispute of material fact as to the alleged First Amendment violation in this case. The Court thus first considers whether there is an underlying Fourth Amendment violation in connection with Buenaventura's detention and interview of M.R.
1. Constitutional Violation: Fourth Amendment
Unlike their Fourth Amendment claim against Buenaventura, Plaintiffs base this portion of their Monell claim on Buenaventura's alleged unreasonable seizure of M.R. when he initially detained and interviewed her. Accordingly, the Court first discusses whether a seizure occurred under the Fourth Amendment.
a. Whether a Seizure Occurred
A Fourth Amendment seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." United States v. Brown , 563 F.3d 410, 415 (9th Cir. 2009) (quoting United States v. Washington , 387 F.3d 1060, 1068 (9th Cir. 2004) ). To determine whether M.R.'s liberty was so restrained, the Court considers the following five factors:
(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.
Id.
Based on the second through fifth factors mentioned above and all the other relevant circumstances, the Court concludes that Buenaventura seized M.R. While Buenaventura was the sole officer present, he was dressed in full official uniform, with his weapon and badge displayed. M.R. was directed-not asked-to enter a private room inside the principal's office, despite her earlier statement that she did not wish to speak with police. See M.R. Depo. at 19:24-20:6 ("[QUESTION:] So when you were .. asked to leave the conference room and go somewhere else, .... [w]ho asked you to get up and move somewhere else?" [ANSWER:] No one really asked me to do something; it was more of, 'Come here,' .... And I didn't want to, necessarily..... I do not want to talk to officers ever without attorneys present or my dad. And I didn't want to that day, and I made that very clear. And it was more of a forced situation."); see also Jones v. Hunt , 410 F.3d 1221, 1227 (10th Cir. 2005) (rejecting trial court's conclusion that a seizure did not occur in part because the student went to the private area where the interview occurred "voluntarily," noting that "[a] reasonable high school student would not have felt free to flaunt a school official's command, leave an office to which she had been sent, and wander the halls of her high school without permission").
Moreover, it appears that, before asking M.R. questions, Buenaventura never told her that she could end the interview at any time or that she was free not to answer his questions. And it is uncontroverted that Buenaventura threatened to arrest M.R. and take her to the police station to continue questioning when she asserted that she would not respond to further questions, *957 and Buenaventura expressly rejected the notion that he needed Rabinovitz's permission or any exigent circumstances to detain and interview M.R. during the encounter. See id. (finding that, regardless of whether the challenged interview was initially consensual, the encounter "transformed into a seizure through [school and law enforcement officials'] alleged threats and demands").
Defendants counter that by refusing to answer Buenaventura's questions and directing him to speak with her attorney instead, M.R. did not submit to his authority so as to preclude the finding of a seizure. Indeed, M.R. refused to cooperate, but that does not controvert the fact that Buenaventura's conduct amounts to a "meaningful interference, however brief, with [M.R.'s] freedom of movement." United States v. Jacobsen , 466 U.S. 109, 113 n.5, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Notably, M.R. remained inside the interview room and did not leave until after Buenaventura left the room and terminated the interview. See Buenaventura Depo. at 103:22-23. A reasonable person-let alone a reasonable 14-year-old high school sophomore, even a precocious one-confronted with the circumstances of this interview would not feel free to leave and go about her business. Buenaventura's conduct therefore constitutes a seizure under the Fourth Amendment.
b. Whether the Seizure was Reasonable
That a seizure occurred does not end the inquiry. To succeed on their Monell claim, Plaintiffs must show that the seizure was unreasonable. See Dees v. County of San Diego , --- F.Supp.3d ----, ----, 2017 WL 4511003, at *7 (S.D. Cal. Oct. 10, 2017) (considering Monell claim predicated on alleged Fourth Amendment violation of suspected child abuse victim's sibling during social worker's in-school interview of sibling).
As explained above, neither the Supreme Court nor the Ninth Circuit has addressed the Fourth Amendment's application to a law enforcement officer's in-school detention and interrogation of a suspected child abuse victim. Acknowledging this, Defendants contend that either reasonable suspicion or the two-part reasonableness standard crafted in New Jersey v. T.L.O. , 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1984), justify Buenaventura's conduct, and they incorporate by reference such arguments presented in their MSJ.[18]
Defendants argue that these reasonableness standards appropriately balance the suspected victim's constitutional rights and the state's compelling interest in protecting against child abuse. Plaintiffs counter that the constitutional standard governing *958 a seizure should not be relaxed when the person detained is a suspected victim as opposed to a suspected perpetrator. Rather, pointing to the Ninth Circuit's decisions in Wallis and Calabretta , supra , Plaintiffs assert that on-campus interviews of minor suspected child abuse victims should be conducted within the constitutional constraints imposed in Fourteenth Amendment removal cases: with parental consent, prior judicial authorization, or the presence of exigent circumstances. Plaintiffs present the better argument.
i. T.L.O. Does Not Apply
In T.L.O. , the Supreme Court adopted a two-part reasonableness test for searches of a student's person or property in the school setting, specifically noting that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." 469 U.S. at 340, 105 S.Ct. 733 ; see id. at 339, 105 S.Ct. 733 ("Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds."), 341 ("[T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause that the subject of the search has violated or is violating the law."). The Court concluded that the legality of the search "should depend simply on the reasonableness, under all the circumstances of the search," under a twofold inquiry: (1) "whether the ... action was justified at its inception;" and (2) "whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " Id. at 341-42, 105 S.Ct. 733 (quoting Terry v. Ohio , 392 U.S.1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ). Typically, said the Court, such a search "will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." Id. at 342, 105 S.Ct. 733. Under the second prong, the search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Id.
Although Defendants posit that several Circuit Courts have applied this standard to seizures of students on school campuses by law enforcement officers, only the Eleventh Circuit appears to have done so. See Gray ex rel. Alexander v. Bostic , 458 F.3d 1295, 1304-06 (11th Cir. 2006) (officer had reasonable basis for seizing student where student threatened to do something physically to her teacher but the seizure's scope was not reasonable where deputy handcuffed student absent any indication of a potential threat to anyone's safety and student was not engaged in further disruptive behavior); see also Loftus , 690 F.3d at 1205-06 (qualified immunity barred minor's claim against social worker related to social worker's interrogation of the minor on school grounds during child welfare investigation because no controlling law required a probable cause showing to interrogate a suspected child abuse victim at school). Notably, in Gray , where the Circuit Court expressly applied the T.L.O. two-part reasonableness test, the seized student was a suspected wrongdoer, not a suspected victim.
The other cases to which Defendants point are also distinguishable. See, e.g. , Shade v. City of Farmington , 309 F.3d 1054, 1060-61 (8th Cir. 2002) (applying T.L.O. standard to law enforcement officers' search of student suspected of possessing a dangerous weapon where school *959 officials initiated the investigation and search, even though the student was on a school field trip and away from "traditional school grounds"); Darryl H. v. Coler , 801 F.2d 893, 900-05 (7th Cir. 1986) (concluding that visual inspections of suspected child abuse victims' bodies do not always require a warrant or probable cause in light of the state's weighty interest in the safety of the child and the stabilization of the home environment). In fact, in the final case cited by Defendants, Jones v. Hunt , supra , the Circuit Court concluded that the District Court's application of the T.L.O. reasonableness standard to the on-campus seizure of a minor involved in a parental custody dispute was "erroneous" because the case did not "involve efforts by school administrators to preserve order on school property and therefore d[id] not merit application of the T.L.O. standard." Id. at 1228 (declining to adopt appropriate Fourth Amendment test because conduct violated the T.L.O. standard); see also Defs' MSJ at 17-18 (citing Gray , Loftus , Shade , Darryl H. , and Jones for the proposition that since T.L.O. courts have applied the lesser reasonableness standard "to school settings involving potential child abuse").
This Court comes to the same conclusion as the Tenth Circuit in Jones . Buenaventura was not faced with the special need envisioned in T.L.O. that justified application of a lesser constitutional standard-to maintain order or discipline on school grounds. There is no evidence that M.R. violated any school rules or policies, and Buenaventura's interview was unrelated to any such violation. Additionally, although Principal Buchanan initiated the detention, he did so at Buenaventura's behest and to further general law enforcement objectives-not to preserve order on school grounds. Rather, M.R. was the suspected victim of child abuse, and it is uncontroverted that no circumstances required her immediate detention in order to "maint[ain] ... swift and informal disciplin[e]." T.L.O. , 469 U.S. at 340, 105 S.Ct. 733. T.L.O. 's twofold inquiry thus does not apply.
ii. Reasonable Suspicion Does Not Apply
A warrantless seizure is "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." United States v. Hawkins , 249 F.3d 867, 872 (9th Cir. 2001) (quoting Minnesota v. Dickerson , 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ). Terry 's reasonable suspicion standard is one of those exceptions. Dickerson , 508 U.S. at 372-73, 113 S.Ct. 2130. Under Terry and its progeny, an officer, without probable cause or a warrant, may "conduct a brief, investigatory stop when [he] has a reasonable, articulable suspicion that criminality is afoot" without violating the detained individual's Fourth Amendment rights. Illinois v. Wardlow , 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing Terry , 392 U.S. at 30, 88 S.Ct. 1868 ). This standard is "less demanding ... than probable cause and requires a showing considerably less than preponderance of the evidence, [but] ... requires at least a minimal level of objective justification." Id. Defendants contend that this reasonable suspicion standard has been applied to other crime-solving circumstances and should therefore be applicable here. The cases which Defendants cite in support of their position, Illinois v. Lidster , 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), and Maxwell v. County of San Diego , 708 F.3d 1075 (9th Cir. 2013), do not persuade this Court that the reasonable suspicion standard applies to the in-school detention of a suspected child abuse victim.
In Lidster , a drunk driver challenged the lawfulness of his arrest and conviction because law enforcement obtained much of *960 the relevant evidence through a highway checkpoint the police had set up to obtain information about an unrelated fatal hit-and-run. 540 U.S. at 421-22, 124 S.Ct. 885. The Supreme Court distinguished the unlawful checkpoint stop at issue in Indianapolis v. Edmond , 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), from the checkpoint the drunk driver challenged. Unlike the Edmond checkpoint-the primary purpose of which was to "uncover evidence of ordinary criminal wrongdoing" and which was unlawful because the stops were "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime" rather than by individualized suspicion-the Lidster checkpoint's primary purpose was "to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others." Lidster , 540 U.S. at 423, 124 S.Ct. 885 ; Edmond , 531 U.S. at 42, 44, 121 S.Ct. 447. Given the "special law enforcement concerns" present in the case, the information-seeking stop's brevity, its nonintrusive nature, and the fact that it likely would not "provoke anxiety" in those stopped for questioning in part because it was not "designed to elicit self-incriminating information," the Court concluded that the information-seeking stop did not require individualized reasonable suspicion to be constitutional. Lidster , 540 U.S. at 424-25, 124 S.Ct. 885.
Significantly, the Lidster Court also noted that just because the " Edmond -type presumptive rule of unconstitutionality" did not apply, that did not make the stop constitutional. Id. at 426, 124 S.Ct. 885. Instead, said the Court, the stop's reasonableness must be judged under the specific circumstances of the case by looking to "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id. at 426-27, 124 S.Ct. 885 (quoting Brown v. Texas , 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ).
In Maxwell , the decedent's parents alleged that their over-five-hour detention and separation from one another by law enforcement officers violated their Fourth Amendment right to be free from unreasonable seizure. 708 F.3d at 1083. Applying the reasonableness standard followed in Lidster , the Ninth Circuit held that the detention violated the parents' clearly established rights. Id. at 1083-84. The Maxwell Court explained that while "the detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive" because "the interest in detaining witnesses for information is of relatively low value." Id. at 1083. Because the crime at issue was solved, the detention was not incident to a search, there was no threat of destruction of evidence, and there was no evidence that law enforcement needed to secure the area, the officers were on notice that the multi-hour-long detention was unreasonable. Id. at 1084-85.
These cases do not instruct this Court that the reasonable suspicion standard should apply to determine the constitutionality of Buenaventura's conduct when interviewing M.R. In fact, neither Lidster nor Maxwell even applied the reasonable suspicion standard. Instead, they applied the balancing test announced in Brown v. Texas to determine the detention's reasonableness under the Fourth Amendment, as indicated above.
A third case, which Defendants do not cite, also supports this Court's conclusion that the reasonable suspicion standard is inapplicable under the facts of this case. In United States v. Ward , noted briefly above, the Ninth Circuit en banc distinguished the vehicular stop of a witness whom law enforcement wanted to question *961 concerning a third party, from the circumstances involved in Terry stops. 488 F.2d at 169 (citing United States v. Bugarin-Casas , 484 F.2d 853 (9th Cir. 1973) (circumstances indicated that the driver may be an illegal alien); Wilson v. Porter , 361 F.2d 412 (9th Cir. 1966) (unusual driving patterns justified detention of car's driver and passenger) ). Using the reasonable suspicion standard as a starting point, the Court concluded that the facts of the case precluded such a finding, in large part because "the stop was not made pursuant to the [law enforcement] agent's founded suspicion that the detainee was involved or about to be involved in criminal activity.... [but] for the purpose of questioning the appellant about a third person ." Id. at 169. Thus, said the Ward Court, the "narrow exception of Terry v. Ohio " could not "be stretched so far." Id. at 169-70 ; cf. Doe v. Bagan , 41 F.3d 571, 574 n.3 (10th Cir. 1994) (social worker's ten-minute-long on-school interview of nine-year-old boy in closed private room was a reasonable seizure as a matter of law under the Terry standard because the boy was a suspected perpetrator of child abuse).
Here, where M.R. was the suspected victim of abuse and not the suspected perpetrator, the reasonable suspicion standard is inappropriate to evaluate the constitutionality of Buenaventura's conduct.
In any event, the circumstances of this case do not satisfy the reasonable suspicion standard, even when the facts are viewed in the light most favorable to Defendants. As in Ward , "there was no crime," or suspicion of any crime, " 'afoot.' " 488 F.2d at 169 ; see also Merriam-Webster Dictionary, Afoot , https://www.merriam-webster.com/dictionary/ afoot (last visited February 25, 2018) (defining "afoot" as "in the process of development[;] under way," "developing or happening now[;] in progress," and "happening now[;] going on"). As explained above in the factual background, the alleged abuse of M.R. happened at some unknown time in the past, the alleged perpetrator lived out of state, and Buenaventura believed the situation required no immediate attention. Moreover, there is no evidence in the record that Buenaventura had any reason to believe Rabinovitz was complicit in any abuse of M.R.
Further, Defendants' attempt to justify Buenaventura's conduct as authorized by California Penal Code section 11174.3 fails. That statute permits law enforcement to interview suspected victims of child abuse at school, but it is silent on the question of parental consent, judicial authorization, exigent circumstances, or any other Fourth Amendment safeguard. See Cal. Penal Code § 11174.3(a). Additionally, as explained above, because the reasonable suspicion standard is inapplicable to the seizure in this case, the fact that section 11174.3 may be "based on Terry v. Ohio ['s]... permi[ssive] brief investigatory stops for criminal investigation" (i.e. , the reasonable suspicion standard), is immaterial. Defs' Opp. at 14.
In sum, neither the T.L.O. two-prong reasonableness test nor the Terry reasonable suspicion standard are applicable to the warrantless seizure in this case, and it is Defendants' burden to show that the subject seizure falls within an exception to the warrant requirement. See Hawkins , 249 F.3d at 872. Because Defendants have failed to do so, the Court concludes that the seizure in this case was unreasonable under the Fourth Amendment.
Doubtless, California has a compelling interest in protecting children against abuse. See Humphries v. County of Los Angeles , 554 F.3d 1170, 1193-94 (9th Cir. 2009), rev'd on other grounds , 562 U.S. 29, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010). Yet, even in this consequential area of crime *962 investigation, law enforcement does not have unbridled discretion. Rather,
in the area of child abuse, as with the investigation and prosecution of all crimes, the state is constrained by the substantive and procedural guarantees of the Constitution. The fact that the suspected crime may be heinous-whether it involves children or adults-does not provide cause for the state to ignore the rights of the accused or any other parties. Otherwise, serious injustices may result. In cases of alleged child abuse, governmental failure to abide by constitutional constraints may have deleterious long-term consequences for the child and, indeed, for the entire family. Ill-considered and improper governmental action may create significant injury where no problem of any kind previously existed.
Wallis , 202 F.3d at 1130-31 ; see also id. at 1138 ("[T]he police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been-or will be-committed."). Under the undisputed facts of this case, Buenaventura would not have run afoul of the Fourth Amendment if he had obtained either prior judicial authorization or parental consent to interview M.R., but he chose not to do so. Because no exigent circumstances were present in this case, such failure violated M.R.'s Fourth Amendment rights.
Before turning to the causal connection between this violation and Municipal Defendants' liability under section 1983, the Court briefly addresses whether Buenaventura's conduct violated Rabinovitz's Fourteenth Amendment rights.
2. Constitutional Violation: Fourteenth Amendment
As explained above, parents have a cognizable liberty interest in the "companionship, care, custody and management of [their] children." Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C. , 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ; see, e.g. , Wallis , 202 F.3d at 1137 n.8. Of course, this right is not absolute. E.g. , Watterson v. Page , 987 F.2d 1, 8 (1st Cir. 1993) ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."). Also as discussed above, the Ninth Circuit does not appear to have addressed the issue of Fourteenth Amendment familial rights outside of the context of the death of a child, the loss of parental rights, the termination of contact with children, or the seizure of children inside the home. See Harry A. , 351 F.Supp.2d at 1068. Thus, this Court must decide whether the unwarranted seizure in this case was "so intrusive as to be the equivalent of termination of [the parent-child] relationship." Id.
At least two sister District Courts considering analogous circumstances recently found that a state official's seizure and subsequent interview of a minor on school grounds without judicial authorization, parental consent, or exigent circumstances, amounted to unconstitutional interference with the parent-child relationship. See Williams v. County of San Diego , No. 17cv815-MMA(JLB), 2017 WL 6541251, at *7-8 (S.D. Cal. Dec. 21, 2017) ; Dees , --- F.Supp.3d at ----, 2017 WL 4511003 at *8 ; see also Doe v. Heck , 327 F.3d 492, 524 (7th Cir. 2003) ("[B]ecause the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of [the child] without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers."). The Court finds the reasoning *963 in these cases persuasive and holds that the seizure of a minor, outside the home and on school grounds, may amount to an actionable violation of a parent's Fourteenth Amendment liberty interest in the parent-child relationship.
Official conduct "that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." Wilkinson v. Torres , 610 F.3d 546, 554 (9th Cir. 2010) (quoting Porter v. Osborn , 546 F.3d 1131, 1137 (9th Cir. 2008) ). As relevant here, such conduct shocks the conscience "[w]here actual deliberation [by the officer] is practical," and the officer acts with "deliberate indifference" to the parental rights at issue. Tatum v. Moody , 768 F.3d 806, 821 (9th Cir. 2014) ; see also Gantt v. City of Los Angeles , 717 F.3d 702, 708 (9th Cir. 2013) ("Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").
In this case, there can be no dispute that actual deliberation was practical. Buenaventura was tasked with investigating the Subject SCAR on May 4, 2015-over two weeks before he decided to interview M.R. at school. Because the Subject SCAR indicated that M.R. was not in immediate danger, that her father was not a suspect, and that the alleged perpetrator likely lived out of state, Buenaventura's decision to appear at M.R.'s school without a warrant or prior notice to and consent from Rabinovitz indicates that he acted with deliberate indifference to Rabinovitz's parental rights. See Wallis , 202 F.3d at 1138 ("[T]he police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been-or will be-committed."). Moreover, in light of Buenaventura's continued detention of and threats to M.R., in direct defiance of Rabinovitz's vocalized objection, it would be unreasonable for a jury to conclude otherwise.
Based on the evidentiary record currently before the Court, Buenaventura's conduct in detaining and interviewing M.R. violated Rabinovitz's parental rights under the Fourteenth Amendment. Accordingly, the Court turns to the next portion of the municipal liability analysis under section 1983.
3. Municipal Liability for Constitutional Violations
Plaintiffs present three theories of municipal liability: (1) the Municipal Defendants' unlawful policy, practice, or custom of interviewing suspected child abuse victims at school caused the constitutional violations complained of; (2) the Municipal Defendants have failed to sufficiently train its officers regarding interviews related to child abuse investigations; and (3) the Municipal Defendants failed to discipline Buenaventura in connection with the constitutional violations alleged in this case.
Before turning to the merits of these claims, the Court briefly addresses the proper scope of the Monell claim. Although not raised by Defendants, Plaintiffs cannot maintain a Monell claim against the LAPD as a matter of law. See United States v. Kama , 394 F.3d 1236, 1239-40 (9th Cir. 2005) (municipal police departments not considered "persons" within meaning of section 1983 (citing Hervey v. Estes , 65 F.3d 784, 791 (9th Cir.), as amended on denial of reh'g (Dec. 5, 1995) ) ); see also Celotex Corp. v. Catrett , 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte , so long as the losing party was on notice *964 that she had to come forward with all of her evidence."). The Court thus GRANTS Defendants' MSJ on the Monell claim as to the LAPD insofar as the claim is predicated on an unconstitutional policy, custom, or practice of causing minor children to be interviewed at school without prior judicial authorization; parental consent, knowledge, or presence; or other reasonable cause.[19]
The Court turns now to the unlawful policy, practice, or custom aspect of Plaintiffs' section 1983 claim against the City.
a. Official Policy or Custom
In order for municipal liability to attach to a city employee's constitutional violation, the plaintiff must show that the employee's constitutional violation was "pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity," and that the policy "was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation." Trevino , 99 F.3d at 918.
Here, Defendants do not appear to dispute that Buenaventura conducted the interview of M.R. pursuant to LAPD policy governing police investigations at school. See Defs' Opp. at 19. Instead, Defendants oppose municipal liability by characterizing LAPD's on-campus interview policy as one of "enforcing Penal Code section 11174.3," which "has never been declared unconstitutional." Id. at 19-20. The Court has not been asked to evaluate the constitutionality of California Penal Code section 11174.3(a), and this Order does not undertake that task. More importantly, the Court's conclusion that the LAPD written and informal policies caused Plaintiffs' constitutional injuries and are constitutionally deficient has no bearing on the constitutionality of section 11174.3(a). Section 11174.3(a) is silent as to the constitutional safeguards discussed in this Order, while LAPD policy is not. See Dees v. County of San Diego , No. 3:14-cv-0189-BEN-DHB, 2016 WL 8673910, at *3 (S.D. Cal. Sept. 30, 2016).
As a preliminary matter, the Court addresses the lawfulness of the City's policy, practice, or custom only in the context presented here-i.e. , where the parent or guardian of the suspected child abuse victim is not the suspected perpetrator.
First, the Court observes that the written policies in effect at the time of Buenaventura's interview-Section 2500 and the May 2013 Notice-are vague with respect to parental notification. See May 2013 Notice at 1 ("[O]fficers conducting an on-campus interview of a child should ... notify the child's parent(s) and/or guardian(s) when appropriate."); Section 2500 (instructing officers to "[r]equest permission to question the student at school" without any guidance regarding from whom such permission should be sought). The current written policy is silent as to parental consent, but the evidence in the record shows that Section 2500 has not been construed by the City to require pre-interview consent from a parent or guardian of the suspected victim. See Ex. 15 to Cox Decl. ("Advice regarding notifying a parent and/or guardian before interviewing a child in an investigation for a crime other than child abuse should be obtained from *965 the Area Juvenile Coordinator, Major Assault Crimes Coordinator or other respective detective coordinator" (emphasis added) ).
Yet, LAPD policy with respect to the in-school interviews of suspected child abuse victims is not confined to these written policies. The uncontroverted facts show that it is the LAPD's custom and practice for officers to uniformly interview suspected child abuse victims at school without prior judicial authorization or parental consent, regardless of exigency. Additionally, as a matter of course, officers do not tell the minor interviewees that they may leave the interview at any time or that they are not required to consent to the interview. The Court agrees with Plaintiffs that these official policies are insufficient to protect against the underlying Fourth and Fourteenth Amendment violations in this case.
While there was no clearly established law at the time of the underlying rights violations that Buenaventura's conduct was unconstitutional, the City may still be liable under section 1983. Defendants' suggestion to the contrary flies in the face of section 1983 precedent. See, e.g. , Mendiola-Martinez v. Arpaio , 836 F.3d 1239, 1249-50 (9th Cir. 2016). Particularly in a case such as this, where the officer acted unlawfully pursuant to official policy, municipal liability is most sensible because there is a "direct causal link" between official policy, practice, or custom and the constitutional deprivation complained of. Id. at 1247.
Further, because it is uncontroverted that Buenaventura-to say nothing of the other juvenile division officers at the LAPD-has conducted between 900 and 1,000 interviews of minors on school grounds, and he called parents beforehand on only two to three occasions even when the parents were not suspected perpetrators, the Court draws the reasonable inference that Plaintiffs' Monell claim based on their Fourth and Fourteenth Amendment violations are not isolated incidents. Accordingly, Plaintiffs have established that official municipal policy caused their underlying rights violations. See Trevino , 99 F.3d at 918 ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").
The Court does not come to the same conclusion with respect to the claim that Buenaventura's conduct is reflective of LAPD policies that allegedly encourage intimidation, fear, threats, coercion, retaliation, misrepresentation, or duress. As explained in the Factual Background, LAPD procedures say nothing about the use of such tactics. In fact, Ramirez indicated that such conduct is not in line with Department policy; is not a best practice; and that if an officer in the field called him because a minor interviewee would not cooperate, he would tell the officer not to threaten the child with arrest. The City thus "cannot be held liable under [ section] 1983" for Buenaventura's coercion or retaliation that allegedly caused the underlying First Amendment violation because Plaintiffs have not "proved the existence of an unconstitutional municipal policy." City of St. Louis v. Praprotnik , 485 U.S. 112, 128, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("Respondent does not contend that anyone in city government ever promulgated, or even articulated, such a policy.").
Plaintiffs' claim for municipal liability based on an unconstitutional custom, practice, or policy therefore fails with respect to the alleged First Amendment violation, and the Court GRANTS in part Defendants' MSJ as to that portion of the Monell claim. Because Plaintiffs have successfully *966 established that unconstitutional customs, practices, or policies caused their Fourth and Fourteenth Amendment violations, the Court DENIES in part Defendants' MSJ and GRANTS Plaintiffs' MSJ on this aspect of the Monell claim.
The Court next evaluates the final two components of Plaintiffs' Monell claim-failure to train and failure to discipline.
b. Failure to Train
Plaintiffs contend that the City's failure to train juvenile officers and recruits on interviewing suspected child abuse victims at school-including the lack of training regarding reasonable suspicion, how to obtain a court order or warrant for an interview, the presence of exigent circumstances, or when and how to contact a parent-amounts to a constitutional violation attributable to the municipality. The Court agrees.
"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of 1983," but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson , 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). To show such inadequacy, Plaintiffs must show that the City's failure to train or adequately supervise "amounts to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact,' " which is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown , 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (2000) ; City of Canton v. Harris , 489 U.S 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ). Accordingly, the City's policymakers must have been "on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." Id. Otherwise, "de facto respondeat superior liability" "would result." Id. at 62, 131 S.Ct. 1350 (quoting Canton , 489 U.S. at 392, 109 S.Ct. 1197 ).
In order to make such a showing, Plaintiffs must either present a "pattern of similar constitutional violations by untrained employees" or they must show that the municipality "has failed to train its employees to handle recurring situations presenting an obvious potential for" constitutional violations. Id. ; Board of Cty. Com'rs of Bryan Cty. v. Brown , 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). In Canton , the U.S. Supreme Court provided an example of the "obvious" case where a single constitutional violation, accompanied by a correlating failure to train, is sufficient to be actionable under section 1983 : "[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n.10, 109 S.Ct. 1197 (citation omitted).
Plaintiffs present no evidence of a pattern of similar constitutional violations by untrained City officers. But, the evidentiary record before the Court makes clear that the City's failure to sufficiently train its officers about constitutional safeguards in the context of interviews of suspected child abuse victims makes this case an obvious one. Given the number of suspected child abuse victims that Buenaventura has interviewed on school campuses in his three years with the juvenile division, it is *967 reasonable to infer that City policymakers here know "to a moral certainty" that their juvenile division officers will be required to interview children to investigate child abuse allegations. Id.
Yet, those officers are not trained on the most basic procedures or standards that ensure vigilance as to constitutional protections under the Fourth and Fourteenth Amendments, such as obtaining judicial authorization or parental consent, or the presence of exigent circumstances. See Gomez Depo. at 93:1-99:19. In fact, even though Defendants argue in their MSJ that reasonable suspicion is the appropriate standard governing interviews of suspected child abuse victims on school campuses, officers are not trained that they need to have reasonable suspicion of child abuse before conducting such interviews. Id. at 93:16-23. Despite the fact that even California's Penal Code section 11174.3 is "subject to the [c]onstitutional requirements of law," a point which the City does not deny, officers are not trained as to "any ... [c]onstitutional requirements ... [that are] superimposed or included in the requirements of Penal Code Section 11174.3 regarding interviewing children at school." Id. at 98:3-99:2. In fact, when asked, Officer Gomez (who trains juvenile officers on the substance of the California law) could not name a single due process requirement to which section 11174.3 is subject. Id. at 95:24-1, 99:16-19.
Based on the uncontroverted evidentiary record before the Court, Plaintiffs have established a failure to train "so patently obvious" that the City should be liable under section 1983 for the Fourth and Fourteenth Amendment violations in this case. Connick , 563 U.S. at 64, 131 S.Ct. 1350. The Court thus DENIES in part Defendants' MSJ and perforce sua sponte GRANTS partial summary judgment in favor of Plaintiffs as to this aspect of the Monell claim.[20]
Plaintiffs have not shown, however, that a failure to train caused the underlying First Amendment violations in this case. The Court therefore GRANTS in part Defendants' MSJ as to that portion of the Monell claim.
c. Failure to Discipline
Finally, the failure to discipline aspect of Plaintiffs' Monell claim fails. Where a plaintiff alleges that a municipality's conduct runs afoul of section 1983 for the city's failure to discipline its employees, the claim is understood as one for ratification. Under this theory, a municipality may be liable for an isolated constitutional violation. Christie v. Iopa , 176 F.3d 1231, 1238 (9th Cir. 1999). "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.' " Sheehan v. City & Cty. of S.F. , 743 F.3d 1211, 1231 (9th Cir. 2014) (quoting Christie , 176 F.3d at 1239 ), rev'd on other grounds , --- U.S. ----, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).
Neither a policymaker's mere knowledge of, nor the policymaker's mere refusal to overrule or discipline, a subordinate's unconstitutional act suffices to show ratification. Christie , 176 F.3d at 1239 ; see *968 Haugen v. Brosseau , 351 F.3d 372, 393 (9th Cir. 2003) (Mem) (granting summary judgment in favor of municipality under ratification doctrine where city and police department failed to discipline officer involved in a shooting), rev'd on other grounds , Brosseau v. Haugen , 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ; Hulstedt v. City of Scottsdale , 884 F.Supp.2d 972, 1014 (D. Ariz. 2012) (no evidence of ratification for municipal liability where police chief approved inferior officer's deadly shooting); see also Weisbuch v. County of Los Angeles , 119 F.3d 778, 781-82 (9th Cir. 1997) ("To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle respondeat superior liability into section 1983 law ...." (quoting Gillette v. Delmore , 979 F.2d 1342, 1348 (9th Cir. 1992) )). Instead, the plaintiff must show that an "authorized policymaker[ ] approve[d] a subordinate's decision and the basis for it ." City of St. Louis v. Praprotnik , 485 U.S. 112 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (emphasis added).
Here, Plaintiffs' sole piece of evidence in support of their ratification theory is the uncontroverted fact that Buenaventura has never been disciplined "in any way in connection with a school interview." Pls' ASUF at ¶ 34. Defendants present evidence that an internal investigation into Rabinovitz's complaint for unlawful detention of M.R. and a falsified police report resulted in the classification of Rabinovitz's allegations as "[u]nfounded, which means that based on the preponderance of evidence standard, the investigation determined that the act(s) alleged did not occur in the manner [Rabinovitz] described." Ex. 7 to Shapero Decl. at 18 [Doc. # 59-8]. This evidence is woefully inadequate to prove ratification.
The Court therefore GRANTS Defendants' MSJ in connection with Plaintiffs' claim for municipal liability under a theory of ratification.
IV.
CONCLUSION
In light of the foregoing, the Court issues the following orders:
1. Defendants' MSJ is DENIED as to Plaintiffs' claim against Buenaventura for First Amendment retaliation; Plaintiffs' claim for Monell liability based on unlawful custom, practice, and policy in connection with the violation of M.R.'s Fourth Amendment rights and Rabinovitz's Fourteenth Amendment rights; and Plaintiffs' claim for Monell liability based on failure to train in connection with the violation of M.R.'s Fourth Amendment rights and Rabinovitz's Fourteenth Amendment rights;
2. Defendants' motion for partial summary judgment is otherwise GRANTED ;
3. Plaintiffs' motion for partial summary judgment is GRANTED as to their claim for Monell liability based on unlawful custom, practice, and policy in connection with the violation of M.R.'s Fourth Amendment rights and Rabinovitz's Fourteenth Amendment rights; and
4. Partial summary judgment is GRANTED as to Plaintiff's claim for Monell liability based on the allegation that the failure to train led to the violation of M.R.'s Fourth Amendment rights and Rabinowitz's Fourteenth Amendment rights.
Although neither side addresses Plaintiffs' claim for injunctive relief in their respective summary judgment motions, the parties' joint stipulation indicates that it remains an available remedy, depending on the instant Order. [Doc. # 57.] The parties are ordered to submit a Joint Report by no later than March 6, 2018 that notifies the Court of the claims and remedies remaining for trial and which of the *969 parties' motions in limine remain at issue. The Court continues the Final Pretrial Conference to March 20, 2018 at 10:00 a.m. , and extends the deadline for the filing of remaining pretrial documents (other than motions in limine ) from March 6, 2018 to March 13, 2018.
IT IS SO ORDERED.

The FAC also named as a defendant Kevin Buchanan, the principal of Oak Park High School at the time of the incident underlying this action. On January 4, 2017, the Court dismissed Buchanan from the action, with prejudice, in light of Plaintiffs' and Buchanan's Joint Stipulation. [Doc. # 29.]

Monell v. New York City Department of Social Services , 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Each side submitted a Statement of Uncontroverted Facts ("SUF") and a separately numbered Statement of Additional Material Facts ("AMF"). [Doc. ## 65-1 ("Pls' SUF"), 66-2 ("Defs' SUF"), 68-1 ("Pls' AMF"), 69-1 ("Defs' AMF").] Each side also filed evidentiary objections. [Doc. ## 65-2 (Defendants' objections), 66-17 (Plaintiffs' objections), 69-5 (same), 69-6 (Plaintiffs' response to Defendants' objections).] The Court rules on the evidentiary objections only insofar as the evidence is relevant to the instant decision. To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objection is OVERRULED as moot.

Excerpts from this deposition may also be found at Doc. ## 61-6, 65-6, and 66-5.

Defendants' relevance objections are OVERRULED . Rabinovitz's knowledge of the SCAR or its underlying circumstances and state officials' suspicion of his involvement are probative of Buenaventura's purported probable cause and reasonable suspicion to detain and question M.R. over Plaintiffs' objections, in the context of Plaintiffs' First Amendment claim, as discussed below.

Officers conduct interviews related to suspected child abuse at schools because the school "has been designated a neutral site for the child." Ex. 2 to Shapero Decl. ("Ramirez Depo.") at 203:25-204:1 [Doc. # 59-3]; see also id. at 204:3-13 ("[I]n the investigation of a SCAR report, very frequently when a certified school employee calls in the SCAR .... [the LAPD] [doesn't] know if the parents live together with the suspect, the perpetrator. So it's [the Department's] responsibility to make contact with the child, determine what actually is going on."). Excerpts from the Ramirez Deposition may also be found at Doc. ## 61-11 and 66-11.

Excerpts from the M.R. Deposition may also be found at Doc. # 61-9.

Excerpts from the Rabinovitz Deposition may also be found at Doc. # 59-5.

The Court SUSTAINS Defendants' objection to Plaintiffs' factual assertions about M.R.'s fear of police and her declining grades. See Pls' SUF at ¶¶ 47-48 (Defendants' objections in response to Plaintiffs' factual assertions). These are not recoverable harms and are therefore irrelevant to Plaintiffs' claims. The Court OVERRULES Defendants' objection to Plaintiffs' factual assertions about M.R.'s increased depression and migraines, however, because those are relevant to her purported physical and mental anguish and Plaintiffs' damages related to medical and related expenses. See id. ; e.g. , FAC at ¶ 37, Prayer.

LAUSD is the abbreviation for Los Angeles Unified School District.

In 2017, changes were made to the LAPD Manual concerning school interviews of child abuse victims. See Ex. 15 to Cox Decl. [Doc. # 61-20]. The governing rule is now numbered Section 25.20. Id. While substantively quite similar to Section 2500, the policy now in effect expressly references Penal Code section 11174.3(a) and adds that "[a]ll police and government agents shall abide by Constitutional tenets." Id.

At the February 16, 2018 hearing on the summary judgment motions, Plaintiffs' counsel stated that Plaintiffs "entered into an agreement with [defense] counsel prior to the filing of the motion that [they] were not seeking a ... judgment against Officer Buenaventura for th[e] seizure [of M.R.]" due to qualified immunity. Hr'g Tr., February 16, 2018, 2:00 PM. Yet, the Court could find nothing in the record or Defendants' moving papers referencing any such agreement. In fact, Defendants moved for summary judgment on the First, Fourth, and Fourteenth Amendment section 1983 claims against Buenaventura in part on the basis of qualified immunity, and Plaintiffs opposed it without any reference to a purported stipulation that would have made the motion unnecessary in that regard. See Defs' MSJ at 2; Pls' Opp. at 15 [Doc. # 66]. Further, the Order dismissing claims pursuant to the parties' joint stipulation, an order which the parties drafted and proposed, states that while Plaintiffs were dismissing the portions of the Fourth, Fourteenth, and First Amendment section 1983 claims "based upon 'Buenaventura's interview,' " such dismissal did "not affect" the Fourth, Fourteenth, and First Amendment section 1983 claims "based upon 'Buenaventura's coercion,' and Plaintiffs are not dismissing, waiving or releasing their claims that [Buenaventura] violated their Constitutional rights when he seized and interviewed [M.R.] on May 21, 2015." [Doc. # 58 (emphasis added).] The underlying joint stipulation indicates an agreement that Buenaventura "would likely be granted qualified immunity" on "certain claims" and that Plaintiffs were abandoning their damages claim against Buenaventura in connection with "Buenaventura's interview," but there is no explicit statement that Plaintiffs were relinquishing their claim against Buenaventura for the seizure of M.R. in either the stipulation or the Order. [Doc. # 57 (emphasis added).] The parties are admonished for failing to clearly streamline the issues for this Court's consideration. The lack of clarity created significant confusion and appears to have resulted in the unnecessary waste of the Court's time and resources and a delay in issuance of the decision. Out of an abundance of caution, in light of the confusion as to what is properly before the Court, the Court's instant rulings on qualified immunity stand.

Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Due to mootness of the appeal, the U.S. Supreme Court vacated the Green e Court's decision as to whether a Fourth Amendment violation had occurred, separate and apart from the qualified immunity discussion. Camreta , 563 U.S. at 713, 131 S.Ct. 2020. While usually a vacated opinion, or portion thereof, would continue to have some precedential value, the Supreme Court made clear that it wanted to prevent the decision "from spawning any legal consequences." Id. (quoting United States v. Munsingwear, Inc. , 340 U.S. 36, 41, 71 S.Ct. 104, 95 L.Ed. 36 (1950) ); see, e.g. , DHX, Inc. v. Allianz AGF MAT, Ltd. , 425 F.3d 1169, 1175-76 (9th Cir. 2005) (noting persuasive value of vacated opinion). Accordingly, the Court does not address the Green e Court's constitutional violation discussion in this Order, and Plaintiffs rightfully did not rely on it in their Opposition to Defendants' MSJ.

Even if Demaree discussed Fourth Amendment rights, it would not help Plaintiffs here because of its recent issuance. See Pearson v. Callahan , 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (for purposes of qualified immunity, courts look to the law "at the time of the defendant's alleged misconduct").

Defendants contend that Plaintiffs never alleged a "continued detention" theory in connection with the First Amendment claim, which Plaintiffs argue in their opposition brief. Plaintiffs do not expressly plead "continued detention" in the FAC, but they do allege that Defendants detained "and thereafter" threatened M.R. in response to her refusal to answer questions. FAC at ¶ 27. In light of the governing federal notice pleading standard, such an allegation sufficiently alerted Defendants to the contours of the First Amendment claim. See Alvarez v. Hill, 518 F.3d 1152 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint claims for relief, not causes of action, statutes or legal theories."); cf. Pruitt v. Cheney , 963 F.2d 1160, 1164 (9th Cir. 1991), amended (May 8, 1992) (plaintiff should have been permitted to assert a claim at the time of trial that was not specifically alleged in the complaint).

Defendants also rely on the Ninth Circuit's 2006 decision in Skoog v. County of Clackamas , but, as will be explained, the holding in that case hurts Defendants more than it helps them.

The parties at times use "reasonable suspicion" interchangeably with the two-part reasonableness test announced in T.L.O. The language used in T.L.O. 's two-part standard comes from Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). See T.L.O. , 469 U.S. at 341, 105 S.Ct. 733 (quoting Terry , 392 U.S. at 20, 88 S.Ct. 1868 when announcing the twofold inquiry). Yet, the "reasonable suspicion" standard used to determine whether a Fourth Amendment seizure is justified, which also comes from Terry , is distinct from the T.L.O. reasonableness test. Compare Terry , 392 U.S. at 30, 88 S.Ct. 1868, with T.L.O. , 469 at 341, 105 S.Ct. 733. Defendants are not alone in collapsing the two standards. See Redding , 557 U.S. at 370, 129 S.Ct. 2633 ("We have thus applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student ...." (citing T.L.O. , 469 U.S. at 342, 105 S.Ct. 733 ) ). Nonetheless, this Court understands the standards to be different, and Defendants appear to urge the application of either one. See Defs' MSJ at 16-22; Defs' Opp. at 14 [Doc. # 65]. Thus, in an abundance of caution, the Court addresses the propriety of the application of both standards to the circumstances of this case.

Although Plaintiffs stated at the February 16, 2018 hearing that they were not pursuing a Monell claim against the Department, the FAC, which governs the claims in this case, alleges the Monell claims against both Municipal Defendants, and neither the Plaintiffs' MSJ nor any stipulation or order of dismissal of claims indicates otherwise. See FAC at 9 ("FOURTH CAUSE OF ACTION MONELL RELATED CLAIMS By Plaintiffs Against Defendants City and LAPD").

"[D]istrict courts are widely acknowledged to possess the power to enter summary judgment sua sponte , so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex , 477 U.S. at 326, 106 S.Ct. 2548. Defendants moved for summary judgment as to this claim, and they were therefore on notice that they had to come forward with sufficient evidence to defeat this claim. Moreover, Defendants' contention that Plaintiffs abandoned this claim simply because Plaintiffs did not move for summary judgment on it is flawed. Plaintiffs opposed Defendants' MSJ as to this aspect of their claim.